APPEAL,CLOSED,TYPE−B

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: <u>1:22−cv−02765−BAH</u>
# *Internal Use Only*

| | |
|---|---|
| BAKER et al v. ISLAMIC REPUBLIC OF IRAN | Date Filed: 09/13/2022 |
| Assigned to: Judge Beryl A. Howell | Date Terminated: 08/28/2025 |
| Demand: $50,000,000,000 | Jury Demand: None |
| Cause: 28:1605A Foreign Sovereign Immunities Act | Nature of Suit: 360 P.I.: Other |
| | Jurisdiction: Federal Question |

**Plaintiff**

**NAMIG BAKER**                    represented by    **Floyd Ronald Jenkins , Jr.**
MERIDIAN 361
400 Congress Street
# 7040
Portland, ME 04101
202−361−4944
Email: jenkins@meridian361.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
BROWNSTONE, P.A.
PO Box 2047
Winter Park, FL 32790
(407) 388−1900
Fax: (407) 622−1511
Email: robertsirianni@brownstonelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
CAMERON FIRM, PC
4003 Wabash Ave
San Diego, CA 92104
(619) 819−5021
Fax: (619) 330−3513
Email: peter@veteranappeal.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**IRINA GORODNITSKY**            represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)

1

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GLENN BAKER**                    represented by    **Floyd Ronald Jenkins , Jr.**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Robert L. Sirianni , Jr.**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Peter Cameron**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAMUEL BAKER**                   represented by    **Floyd Ronald Jenkins , Jr.**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Robert L. Sirianni , Jr.**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Peter Cameron**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATIG BAKER**                    represented by    **Floyd Ronald Jenkins , Jr.**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Robert L. Sirianni , Jr.**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Peter Cameron**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHNNY BUTLER, JR.**                    represented by    **Floyd Ronald Jenkins , Jr.**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Robert L. Sirianni , Jr.**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Peter Cameron**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JAYLEN BUTLER**                         represented by    **Floyd Ronald Jenkins , Jr.**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Robert L. Sirianni , Jr.**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Peter Cameron**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**J. B.**                                 represented by    **Floyd Ronald Jenkins , Jr.**
*a minor, by and through Johnny Butler,*                   (See above for address)
*Jr., next friend*                                         *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Robert L. Sirianni , Jr.**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Peter Cameron**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**A. B.**                                 represented by    **Peter Cameron**
*a minor, by and through Johnny Butler,*                   (See above for address)
*Jr., next friend*                                         *ATTORNEY TO BE NOTICED*
*TERMINATED: 01/22/2024*

**Plaintiff**

**JOHNATHAN BUTLER**                  represented by **Floyd Ronald Jenkins , Jr.**
                                       (See above for address)
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*

                                       **Robert L. Sirianni , Jr.**
                                       (See above for address)
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*

                                       **Peter Cameron**
                                       (See above for address)
                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MECKO JOHNSON**                      represented by **Floyd Ronald Jenkins , Jr.**
                                       (See above for address)
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*

                                       **Robert L. Sirianni , Jr.**
                                       (See above for address)
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*

                                       **Peter Cameron**
                                       (See above for address)
                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ARLETHA PETTIE**                     represented by **Floyd Ronald Jenkins , Jr.**
                                       (See above for address)
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*

                                       **Robert L. Sirianni , Jr.**
                                       (See above for address)
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*

                                       **Peter Cameron**
                                       (See above for address)
                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**CLAUDIA PETTIE**                     represented by **Floyd Ronald Jenkins , Jr.**
                                       (See above for address)
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*

4

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SHERITA SANDERS**                    represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KEVIN DEAS, SR.**                    represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ANNMARIE DEAS**                    represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                    Peter Cameron
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**K. D.**                              represented by   **Floyd Ronald Jenkins , Jr.**
*a minor, by and through Kevin Deas, Sr.,*              (See above for address)
*next friend*                                          *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                    **Robert L. Sirianni , Jr.**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Peter Cameron**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**A. D.**                              represented by   **Floyd Ronald Jenkins , Jr.**
*a minor, by and through Kevin Deas, Sr.,*              (See above for address)
*next friend*                                          *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                    **Robert L. Sirianni , Jr.**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Peter Cameron**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHRISTOPHER HARDESTY**               represented by   **Floyd Ronald Jenkins , Jr.**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                    **Robert L. Sirianni , Jr.**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Peter Cameron**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JAMES HARDESTY**                    represented by   **Floyd Ronald Jenkins , Jr.**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Robert L. Sirianni , Jr.**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Peter Cameron**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**KELLI HARDESTY**                    represented by   **Floyd Ronald Jenkins , Jr.**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Robert L. Sirianni , Jr.**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Peter Cameron**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**NICHOLAS HARDESTY**                 represented by   **Floyd Ronald Jenkins , Jr.**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Robert L. Sirianni , Jr.**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Peter Cameron**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**GRADY HORNER**                      represented by   **Floyd Ronald Jenkins , Jr.**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Robert L. Sirianni , Jr.**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CAMERON HORNER**                    represented by  **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHN IASIELLO**                    represented by  **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DANIEL KERNAN**                    represented by  **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JAMES KERNAN**                            represented by  **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LEAANN MCCARTNEY**                        represented by  **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DONALD MCDANIEL, JR.**                    represented by  **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DONALD MCDANIEL, SR.**                    represented by  **Floyd Ronald Jenkins , Jr.**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**JAMES MCDANIEL**                     represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**LOGAN MCDANIEL**                     represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**SHELBY MCDANIEL**                    represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**TERESA DEFUSTO**                  represented by  **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**ARIK MILLER**                  represented by  **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**CALANDRA BAILEY**                  represented by  **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ARIKA MILLER**                          represented by   **Floyd Ronald Jenkins , Jr.**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Robert L. Sirianni , Jr.**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Peter Cameron**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**TYRESHA WILLIAMS**                      represented by   **Floyd Ronald Jenkins , Jr.**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Robert L. Sirianni , Jr.**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Peter Cameron**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MICHAEL PABON**                         represented by   **Floyd Ronald Jenkins , Jr.**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Robert L. Sirianni , Jr.**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Peter Cameron**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**EVA CARRERA**                           represented by   **Floyd Ronald Jenkins , Jr.**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MARICRUZ CARRERA**                    represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BRANDON PAREDES**                    represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ADAM PAREDES**                    represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

13

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

GARY PAREDES                        represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

JESSE PAREDES                       represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

JULIE PAREDES                       represented by    **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ESTATE OF NEVAEH PAREDES**
*by and through Brandon Paredes, as*
*Special Administrator*

represented by **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EVAN PRONZATI**

represented by **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOSEPH SANDLIN**

represented by **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAVANNAH SANDLIN**

represented by **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SCOTT SMITH**                  represented by  **Floyd Ronald Jenkins , Jr.**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Robert L. Sirianni , Jr.**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Peter Cameron**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**R. S.**                        represented by  **Floyd Ronald Jenkins , Jr.**
*a minor, by and through Scott Smith, next*      (See above for address)
*friend*                                         *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Robert L. Sirianni , Jr.**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Peter Cameron**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**W. S.**                        represented by  **Floyd Ronald Jenkins , Jr.**
*a minor, by and through Scott Smith, next*      (See above for address)
*friend*                                         *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Robert L. Sirianni , Jr.**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Peter Cameron**
                                                (See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ANDREW VEGA**                    represented by   **Floyd Ronald Jenkins , Jr.**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Robert L. Sirianni , Jr.**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Peter Cameron**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**RYAN WINSTON**                   represented by   **Floyd Ronald Jenkins , Jr.**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Robert L. Sirianni , Jr.**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Peter Cameron**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**AMARI WINSTON**                  represented by   **Floyd Ronald Jenkins , Jr.**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Robert L. Sirianni , Jr.**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Peter Cameron**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ARSHIANNA REECE**                represented by   **Floyd Ronald Jenkins , Jr.**
                                                    (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**COURTNEY WINSTON**                 represented by   **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**SHERMAN WINSTON**                 represented by   **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**JAZMINE WINSTON**                 represented by   **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**MERREL WINSTON**                          represented by   **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**SOPHRONIA WINSTON**                       represented by   **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**ALL PLAINTIFFS**                          represented by   **Floyd Ronald Jenkins , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Cameron**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert L. Sirianni , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ISLAMIC REPUBLIC OF IRAN**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/13/2022 | 1 | COMPLAINT against ISLAMIC REPUBLIC OF IRAN ( Filing fee $ 402 receipt number ADCDC–9513184) filed by ALL PLAINTIFFS. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Cameron, Peter) Modified on 9/15/2022 to edit docket text (znmg). (Entered: 09/13/2022) |
| 09/13/2022 | 2 | Ex Parte MOTION for Waiver *of Local Civil Rule 5.1(c)* by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order)(Cameron, Peter) Modified on 9/15/2022 to edit docket text (znmg). (Entered: 09/13/2022) |
| 09/15/2022 | | Case Assigned to Chief Judge Beryl A. Howell. (znmg) (Entered: 09/15/2022) |
| 09/15/2022 | 3 | SUMMONS (1) Issued Electronically as to ISLAMIC REPUBLIC OF IRAN. (Attachment: # 1 Notice and Consent)(znmg) (Entered: 09/15/2022) |
| 09/15/2022 | 4 | STANDING ORDER. Signed by Chief Judge Beryl A. Howell on September 15, 2022. (lcbah2) (Entered: 09/15/2022) |
| 09/15/2022 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 2 *Ex Parte* Motion for Waiver of Local Civil Rule 5.1(c)(1) ("Pls.' Mot."). Generally, "[t]he first filing by or on behalf of a party shall have in the caption the... full residence address of the party," and "[f]ailure to provide the address information within 30 days of filing may result in the dismissal of the case against the defendant." LCvR 5.1(c)(1). Courts apply the factors identified in *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980), to determine when a party's privacy interests are sufficiently weighty to overcome the general presumption in favor of public access to information concerning judicial proceedings. |
| | | Here, an evaluation of all the *Hubbard* factors supports granting plaintiffs' request. Plaintiffs are the victims of terrorist attacks and members of the victims' families, and they allege that Iran assisted those who carried out various improvised explosive device ("IED"), vehicle–borne IED, rocket, grenade, and ambush attacks and bombings from approximately 2008 to 2012 in Afghanistan that caused serious harm to the plaintiff victims. Compl. &para&para 1–2, 154–244 (detailing the various attacks), ECF No. 1. Plaintiffs express concern that disclosure of their addresses "will expose them to retaliation, including further risk of intimidation, harassment and threats to their personal safety." Pls.' Mot. &para 4. This Court has routinely allowed plaintiffs to omit their addresses when bringing terrorism–related claims against Iran if the plaintiffs express concern regarding possible harassment or threats to their safety. *See, e.g.*, Min. Order, *Singer v. Islamic Republic of Iran*, No. 21–cv–2639 (BAH) (D.D.C. Oct. 12, 2021); Order, *Mustard v. Iran*, No. 21–cv–163 (BAH) (D.D.C. Jan. 21, 2021). No prejudice would result from plaintiffs in this case omitting their residential addresses, nor is there significant public interest in their residential addresses. Under these circumstances, sufficient cause exists to grant plaintiffs' request to omit their residential addresses from filings with this Court. It is further ORDERED that plaintiffs shall file, under seal, a list containing their residential addresses within |

| | | |
|---|---|---|
| | | 30 days. Signed by Chief Judge Beryl A. Howell on September 15, 2022. (lcbah2) (Entered: 09/15/2022) |
| 09/29/2022 | 5 | SEALED DOCUMENT filed by DONALD MCDANIEL, SR., ALL PLAINTIFFS, A. B., J. B., CALANDRA BAILEY, GLENN BAKER, NAMIG BAKER, NATIG BAKER, SAMUEL BAKER, JAYLEN BUTLER, JOHNATHAN BUTLER, JOHNNY BUTLER, JR., EVA CARRERA, MARICRUZ CARRERA, A. D., K. D., ANNMARIE DEAS, KEVIN DEAS, SR., TERESA DEFUSTO, ESTATE OF NEVAEH PAREDES, IRINA GORODNITSKY, CHRISTOPHER HARDESTY, JAMES HARDESTY, KELLI HARDESTY, NICHOLAS HARDESTY, CAMERON HORNER, GRADY HORNER, JOHN IASIELLO, MECKO JOHNSON, DANIEL KERNAN, JAMES KERNAN, LEAANN MCCARTNEY, JAMES MCDANIEL, LOGAN MCDANIEL, SHELBY MCDANIEL, DONALD MCDANIEL, JR., ARIK MILLER, ARIKA MILLER, MICHAEL PABON, ADAM PAREDES, BRANDON PAREDES, GARY PAREDES, JESSE PAREDES, JULIE PAREDES, ARLETHA PETTIE, CLAUDIA PETTIE, EVAN PRONZATI, ARSHIANNA REECE, R. S., W. S., SHERITA SANDERS, JOSEPH SANDLIN, SAVANNAH SANDLIN, SCOTT SMITH, ANDREW VEGA, TYRESHA WILLIAMS, AMARI WINSTON, COURTNEY WINSTON, JAZMINE WINSTON, MERREL WINSTON, RYAN WINSTON, SHERMAN WINSTON, SOPHRONIA WINSTON re Order on Motion for Waiver,,,,,,,, (This document is SEALED and only available to authorized persons.)(Cameron, Peter) (Entered: 09/29/2022) |
| 10/18/2022 | 6 | AFFIDAVIT REQUESTING FOREIGN MAILING by ALL PLAINTIFFS. (Attachments: # 1 Exhibit Letter Requesting Foreign Mailing)(Cameron, Peter) (Main Document 6 replaced on 10/21/2022) (zed). (Entered: 10/18/2022) |
| 11/01/2022 | 7 | NOTICE provided by Counsel to the Clerk of the Court re 6 Affidavit Requesting Foreign Mailing. Clerk's Office has been notified that DHL no long delivers to Iran or to Syria. (zed) (zed). Modified docket text on 11/23/2022 (zed). (Entered: 11/01/2022) |
| 11/22/2022 | 8 | MOTION for Order *Permitting Plaintiffs to Proceed With Service Under 28 U.S.C. § 1608(a)(4)* by ALL PLAINTIFFS. (Attachments: # 1 Declaration with Exhibits A–D, # 2 Text of Proposed Order)(Cameron, Peter) (Entered: 11/22/2022) |
| 11/22/2022 | 9 | NOTICE *of Failed Service Under 28 U.S.C. Section 1608(a)(3)* by ALL PLAINTIFFS (Cameron, Peter) (Entered: 11/22/2022) |
| 11/28/2022 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 8 Motion for Order Permitting Plaintiffs to Proceed with Service under 28 U.S.C. &sect 1608(a)(4); DIRECTING plaintiffs to submit to the Clerk of Court all documents required by 28 U.S.C. &sect 1608(a)(4) for service upon a foreign state; and FURTHER DIRECTING the Clerk of Court to thereafter dispatch the documents submitted by plaintiffs, at plaintiffs' expense, to the U.S. Department of State, in accordance with 28 U.S.C. § 1608(a)(4). Signed by Chief Judge Beryl A. Howell on November 28, 2022. (lcbah2) (Entered: 11/28/2022) |
| 11/30/2022 | 10 | AFFIDAVIT REQUESTING FOREIGN MAILING *Under 28 U.S.C. § 1608(a)(4)* by ALL PLAINTIFFS. (Attachments: # 1 Exhibit Letter Requesting Foreign Mailing via Diplomatic Channels)(Cameron, Peter) (Main Document 10 replaced on 11/30/2022) (znmw). (Entered: 11/30/2022) |
| 12/07/2022 | 11 | REQUEST from ALL PLAINTIFFS for the Clerk to effect service of two copies of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state, by FedEx, to the U. S. Department of State, |

| | | |
|---|---|---|
| | | Director of Overseas Citizens Services, pursuant to 28 U.S.C. 1608(a)(4). (See Docket Entry 10 to view document) (zjm) (Entered: 12/07/2022) |
| 12/07/2022 | 12 | CERTIFICATE OF CLERK of mailing two copies of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state on 12/07/2022, by FedEx, to the U. S. Department of State, Director of Overseas Citizens Services, pursuant to 28 U.S.C. 1608(a)(4). (Attachment: # 1 Waybill) (zjm) (Entered: 12/07/2022) |
| 04/14/2023 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to ISLAMIC REPUBLIC OF IRAN served on 3/6/2023, answer due 5/5/2023. (Cameron, Peter) (Entered: 04/14/2023) |
| 05/08/2023 | 14 | AFFIDAVIT FOR DEFAULT by ALL PLAINTIFFS. (Cameron, Peter) (Entered: 05/08/2023) |
| 05/15/2023 | 15 | Clerk's ENTRY OF DEFAULT as to ISLAMIC REPUBLIC OF IRAN. (zed) (Entered: 05/15/2023) |
| 05/24/2023 | 16 | NOTICE *of Intent to Apply for Entry of Default Judgment* by ALL PLAINTIFFS (Cameron, Peter) (Entered: 05/24/2023) |
| 11/01/2023 | 17 | NOTICE *OF REVISED INTENT TO APPLY FOR ENTRY OF DEFAULT JUDGMENT* by ALL PLAINTIFFS (Cameron, Peter) (Entered: 11/01/2023) |
| 01/22/2024 | 18 | NOTICE of Voluntary Dismissal re A.B., a minor, by and through Johnny Butler, Jr., next friend *This has no effect on the claims asserted by the other Plaintiffs.* (Cameron, Peter) (Entered: 01/22/2024) |
| 01/25/2024 | | MINUTE ORDER (paperless) DISMISSING, upon consideration of plaintiff A.B.'s 18 Notice of Voluntary Dismissal, that plaintiff's lawsuits against defendant, without prejudice. *See* Fed. R. Civ. P. 41(a)(1)(A)(i). The Clerk of Court is directed to terminate plaintiff A.B. from this matter. Signed by Judge Beryl A. Howell on January 25, 2024. (lcbah2) (Entered: 01/25/2024) |
| 02/28/2024 | 19 | NOTICE *OF REVISED INTENT TO APPLY FOR ENTRY OF DEFAULT JUDGMENT* by ALL PLAINTIFFS (Cameron, Peter) (Entered: 02/28/2024) |
| 04/16/2024 | 20 | NOTICE *OF REVISED INTENT TO APPLY FOR ENTRY OF DEFAULT JUDGMENT* by ALL PLAINTIFFS (Cameron, Peter) (Entered: 04/16/2024) |
| 06/04/2024 | 21 | MOTION for Leave to File *Excess Pages* by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order)(Cameron, Peter) (Entered: 06/04/2024) |
| 06/05/2024 | | MINUTE ORDER (paperless) DENYING WITHOUT PREJUDICE plaintiffs' 21 Motion for Leave to File Excess Pages, without additional information on the exact number of exhibits plaintiffs intend to offer, the size or length of such exhibits, or why a live hearing would not be appropriate or possible for plaintiffs to establish liability in this case; and ORDERING plaintiffs to SHOW CAUSE, by June 20, 2024, why the claims in this case should not be either: (1) dismissed, given that plaintiffs' claims fail to identify any extrajudicial killing that resulted from any of the sixteen identified alleged terrorist attacks, *see Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1057 (D.C. Cir. 2024) (holding that district courts lack jurisdiction to consider claims under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, if the event underlying the claims did not result in an "extrajudicial killing," within the meaning of Section 3 of |

| | | |
|---|---|---|
| | | the Torture Victim Protection Act of 1991 (28 U.S.C. § 1350 note)); <u>or</u> (2) severed into separate cases for each alleged terrorist attack, given that the complaint asserts claims by plaintiffs injured in sixteen disparate alleged terrorist attacks that occurred on sixteen different dates over a five year period in at least nine different provinces of Afghanistan, see Pls.' Mot. for Leave to File Excess Pages at 4, ECF No. 21, such that the victims and other salient circumstances of each disparate alleged terrorist attack may be entirely separable. *See* Fed. R. Civ. P. 21 (providing that "[t]he court may... sever any claim against any party."); *see also Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968) (holding that Rule 21 "authorizes the severance of any claim, even without a finding of improper joinder, where there are sufficient other reasons for ordering a severance."); *Applewhite v. Reichhold Chems., Inc.*, 67 F.3d 571, 574 (5th Cir. 1995) (holding that Rule 21 gives the court "discretion to sever an action if it... might otherwise cause delay or prejudice"); *Aiello v. Kingston*, 947 F.2d 834, 835 (7th Cir. 1991) (observing that "[Rule] 21 allows a court to sever claims that are logically distinct"); 4 James Wm. Moore et al., Moores Federal Practice § 21.05 (3d ed. 2013) ("the courts agree that Rule 21 may apply even in the absence of misjoinder or nonjoinder" and "[t]he trial court thus has great discretion to restructure an action to promote the efficient administration of justice"). Signed by Judge Beryl A. Howell on June 5, 2024. (lcbah2) (Entered: 06/05/2024) |
| 06/20/2024 | <u>22</u> | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by ALL PLAINTIFFS (This document is SEALED and only available to authorized persons.) (Attachments: # <u>1</u> Text of Proposed Order, # <u>2</u> Exhibit PLAINTIFFS REPLY TO ORDER TO SHOW CAUSE AND REQUEST FOR RECONSIDERATION, # <u>3</u> Exhibit 1 of 12, # <u>4</u> Exhibit 2 of 12, # <u>5</u> Exhibit 3 of 12, # <u>6</u> Exhibit 4 of 12, # <u>7</u> Exhibit 5 of 12, # <u>8</u> Exhibit 6 of 12, # <u>9</u> Exhibit 7 of 12, # <u>10</u> Exhibit 8 of 12, # <u>11</u> Exhibit 9 of 12, # <u>12</u> Exhibit 10 of 12, # <u>13</u> Exhibit 11 of 12, # <u>14</u> Exhibit 12 of 12)(Cameron, Peter) (Entered: 06/20/2024) |
| 06/26/2024 | | MINUTE ORDER (paperless) GRANTING plaintiffs' <u>22</u> Motion For Leave to Place Under Seal Plaintiffs' Reply to Order to Show Cause and Request For Reconsideration, and All Exhibits, and DIRECTING the Clerk of Court to file plaintiff's [22–2] Reply to Order to Show Cause and Request for Reconsideration on the docket under seal. Signed by Judge Beryl A. Howell on June 26, 2024. (lcbah2) (Entered: 06/26/2024) |
| 06/26/2024 | <u>23</u> | SEALED RESPONSE to Judge Howell's 6/5/2024 MINUTE Order filed by ALL PLAINTIFFS. This document is SEALED and is available to authorized persons only. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12)(mg) (Entered: 06/28/2024) |
| 06/26/2024 | 24 | SEALED MOTION for Reconsideration of 6/5/2024 MINUTE Order, filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.) (See docket entry <u>23</u> to view document).(mg) (Entered: 06/28/2024) |
| 08/15/2024 | <u>25</u> | NOTICE *OF REVISED INTENT TO APPLY FOR ENTRY OF DEFAULT JUDGMENT* by ALL PLAINTIFFS (Cameron, Peter) (Entered: 08/15/2024) |
| 09/27/2024 | <u>26</u> | NOTICE *OF REVISED INTENT TO APPLY FOR ENTRY OF DEFAULT JUDGMENT* by ALL PLAINTIFFS (Cameron, Peter) (Entered: 09/27/2024) |
| 10/03/2024 | <u>27</u> | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by ALL PLAINTIFFS (This document is SEALED and only available to authorized persons.) (Attachments: # <u>1</u> Text of Proposed Order, # <u>2</u> Exhibit, # <u>3</u> Exhibit, # <u>4</u> |

| | | |
|---|---|---|
| | | Exhibit, # 5 Exhibit, # 6 Exhibit 1 of 86, # 7 Exhibit 2 of 86, # 8 Exhibit 3 of 86, # 9 Exhibit 4 of 86, # 10 Exhibit 5 of 86, # 11 Exhibit 6 of 86, # 12 Exhibit 7 of 86, # 13 Exhibit 8 of 86, # 14 Exhibit 9 of 86, # 15 Exhibit 10 of 86, # 16 Exhibit 11 of 86, # 17 Exhibit 12 of 86, # 18 Exhibit 13 of 86, # 19 Exhibit 14 of 86, # 20 Exhibit 15 of 86, # 21 Exhibit 16 of 86, # 22 Exhibit 17 of 86, # 23 Exhibit 18 of 86, # 24 Exhibit 19 of 86, # 25 Exhibit 20 of 86, # 26 Exhibit 21 of 86, # 27 Exhibit 22 of 86, # 28 Exhibit 23 of 86, # 29 Exhibit 24 of 86, # 30 Exhibit 25 of 86, # 31 Exhibit 26 of 86, # 32 Exhibit 27 of 86, # 33 Exhibit 28 of 86, # 34 Exhibit 29 of 86, # 35 Exhibit 30 of 86, # 36 Exhibit 31 of 86, # 37 Exhibit 32 of 86, # 38 Exhibit 33 of 86, # 39 Exhibit 34 of 86, # 40 Exhibit 35 of 86, # 41 Exhibit 36 of 86, # 42 Exhibit 37 of 86, # 43 Exhibit 38 of 86, # 44 Exhibit 39 of 86, # 45 Exhibit 40 of 86, # 46 Exhibit 41 of 86, # 47 Exhibit 42 of 86, # 48 Exhibit 43 of 86, # 49 Exhibit 44 of 86, # 50 Exhibit 45 of 86, # 51 Exhibit 46 of 86, # 52 Exhibit 47 of 86, # 53 Exhibit 48 of 86, # 54 Exhibit 49 of 86, # 55 Exhibit 50 of 86, # 56 Exhibit 51 of 86, # 57 Exhibit 52 of 86, # 58 Exhibit 53 of 86, # 59 Exhibit 54 of 86, # 60 Exhibit 55 of 86, # 61 Exhibit 56 of 86, # 62 Exhibit 57 of 86, # 63 Exhibit 58 of 86, # 64 Exhibit 59 of 86, # 65 Exhibit 60 of 86, # 66 Exhibit 61 of 86, # 67 Exhibit 62 of 86, # 68 Exhibit 63 of 86, # 69 Exhibit 64 of 86, # 70 Exhibit 65 of 86, # 71 Exhibit 66 of 86, # 72 Exhibit 67 of 86, # 73 Exhibit 68 of 86, # 74 Exhibit 69 of 86, # 75 Exhibit 70 of 86, # 76 Exhibit 71 of 86, # 77 Exhibit 72 of 86, # 78 Exhibit 73 of 86, # 79 Exhibit 74 of 86, # 80 Exhibit 75 of 86, # 81 Exhibit 76 of 86, # 82 Exhibit 77 of 86, # 83 Exhibit 78 of 86, # 84 Exhibit 79 of 86, # 85 Exhibit 80 of 86, # 86 Exhibit 81 of 86, # 87 Exhibit 82 of 86, # 88 Exhibit 83 of 86, # 89 Exhibit 84 of 86, # 90 Exhibit 85 of 86, # 91 Exhibit 86 of 86)(Cameron, Peter) (Entered: 10/03/2024) |
| 10/03/2024 | 28 | MOTION to Take Judicial Notice *and Memorandum of Points and Authorities* by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, 1 of 7, # 3 Exhibit B, 2 of 7, # 4 Exhibit C, 3 of 7, # 5 Exhibit D, 4 of 7, # 6 Exhibit E, 5 of 7, # 7 Exhibit F, 6 of 7, # 8 Exhibit G, 7 of 7)(Cameron, Peter) (Entered: 10/03/2024) |
| 10/09/2024 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 27 Sealed Motion for Leave to File Document Under Seal and DIRECTING plaintiffs to file, by October 25, 2024, a redacted version of their motion for default judgment and proposed findings of fact and conclusions of law on the public docket, excluding any exhibits consisting substantially of personal medical records, declarations, administrative files, proof of citizenship, or other personally identifying information raising privacy and safety concerns. Signed by Judge Beryl A. Howell on October 9, 2024. (lcbah2) (Entered: 10/09/2024) |
| 10/09/2024 | 29 | SEALED DOCUMENT filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit 1 of 86, # 5 Exhibit 2 of 86, # 6 Exhibit 3 of 86, # 7 Exhibit 4 of 86, # 8 Exhibit 5 of 86, # 9 Exhibit 6 of 86, # 10 Exhibit 7 of 86, # 11 Exhibit 8 of 86, # 12 Exhibit 9 of 86, # 13 Exhibit 10 of 86, # 14 Exhibit 11 of 86, # 15 Exhibit 12 of 86, # 16 Exhibit 13 of 86, # 17 Exhibit 14 of 86, # 18 Exhibit 15 of 86, # 19 Exhibit 16 of 86, # 20 Exhibit 17 of 86, # 21 Exhibit 18 of 86, # 22 Exhibit 19 of 86, # 23 Exhibit 20 of 86, # 24 Exhibit 21 of 86, # 25 Exhibit 22 of 86, # 26 Exhibit 23 of 86, # 27 Exhibit 24 of 86, # 28 Exhibit 25 of 86, # 29 Exhibit 26 of 86, # 30 Exhibit 27 of 86, # 31 Exhibit 28 of 86, # 32 Exhibit 29 of 86, # 33 Exhibit 30 of 86, # 34 Exhibit 31 of 86, # 35 Exhibit 32 of 86, # 36 Exhibit 33 of 86, # 37 Exhibit 34 of 86, # 38 Exhibit 35 of 86, # 39 Exhibit 36 of 86, # 40 Exhibit 37 of 86, # 41 Exhibit 38 of 86, # 42 Exhibit 39 of 86, # 43 Exhibit 40 of 86, # 44 Exhibit 41 of 86, # 45 Exhibit 42 of 86, # 46 Exhibit 43 of 86, # 47 Exhibit 44 of 86, # 48 Exhibit 45 of 86, # 49 Exhibit 46 of 86, # |

| | | |
|---|---|---|
| | | 50 Exhibit 47 of 86, # 51 Exhibit 48 of 86, # 52 Exhibit 49 of 86, # 53 Exhibit 50 of 86, # 54 Exhibit 51 of 86, # 55 Exhibit 52 of 86, # 56 Exhibit 53 of 86, # 57 Exhibit 54 of 86, # 58 Exhibit 55 of 86, # 59 Exhibit 56 of 86, # 60 Exhibit 57 of 86, # 61 Exhibit 58 of 86, # 62 Exhibit 59 of 86, # 63 Exhibit 60 of 86, # 64 Exhibit 61 of 86, # 65 Exhibit 62 of 86, # 66 Exhibit 63 of 86, # 67 Exhibit 64 of 86, # 68 Exhibit 65 of 86, # 69 Exhibit 66 of 86, # 70 Exhibit 67 of 86, # 71 Exhibit 68 of 86, # 72 Exhibit 69 of 86, # 73 Exhibit 70 of 86, # 74 Exhibit 71 of 86, # 75 Exhibit 72 of 86, # 76 Exhibit 73 of 86, # 77 Exhibit 74 of 86, # 78 Exhibit 75 of 86, # 79 Exhibit 76 of 86, # 80 Exhibit 77 of 86, # 81 Exhibit 78 of 86, # 82 Exhibit 79 of 86, # 83 Exhibit 80 of 86, # 84 Exhibit 81 of 86, # 85 Exhibit 82 of 86, # 86 Exhibit 83 of 86, # 87 Exhibit 84 of 86, # 88 Exhibit 85 of 86, # 89 Exhibit 86 of 86)(mg) (Entered: 10/10/2024) |
| 10/10/2024 | | Set/Reset Deadlines: Redacted Version Of Motion For Default Judgment And Proposed Findings Of Fact And Conclusions Of Law On Public Docket due by 10/25/2024. (mac) (Entered: 10/10/2024) |
| 10/23/2024 | 30 | SEALED DOCUMENT filed by ALL PLAINTIFFS re 27 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by ALL PLAINTIFFS (This document is SEALED and only available to authorized persons.) (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit)(Cameron, Peter) (Entered: 10/23/2024) |
| 10/24/2024 | 31 | MOTION for Default Judgment as to *DEFENDANT, ISLAMIC REPUBLIC OF IRAN* by ALL PLAINTIFFS. (Attachments: # 1 Memorandum in Support Proposed Findings of Fact, Conclusions of Law, Table of Contents, Table of Authorities (Redacted), # 2 Exhibit Index of Exhibits (Redacted), # 3 Exhibit 78, # 4 Exhibit 79 (Redacted), # 5 Exhibit 80, # 6 Exhibit 81, # 7 Text of Proposed Order)(Cameron, Peter) (Entered: 10/24/2024) |
| 07/24/2025 | | MINUTE ORDER (paperless) DIRECTING plaintiffs, by July 29, 2025, to:<br><br>(1) identify any other cases filed against defendant Iran, pursuant to the Foreign Sovereign Immunities Act ("FSIA"), in which any of the sixteen terrorist attacks at issue in this case have previously been the basis for a claim raised by any plaintiff, given that at least two of the attacks at issue in the instant case appear to have been at issue in *Cabrera v. Islamic Republic of Iran*, 19–cv–3835 (JDB) (D.D.C.), *e.g.*, *compare id.*, Am. Compl. ¶¶ 971–75, ECF No. 133 (advancing claim based on the death of Michael J. Knapp in a May 18, 2012, attack by the Taliban in Kunar Province, Afghanistan); *id.* ¶¶ 1682–85 (advancing claim based on the death of Jonathan Yanney in an August 18, 2009, attack by the Taliban in Kandahar Province, Afghanistan), *with* Pls.' 29 Sealed Mot. for Default J., Exs. 17 & 64 (appearing to refer to the same two attacks); and<br><br>(2) explain, if any of the attacks at issue in this case have previously been the basis for claims in any other case filed prior to the pendency of the instant case, as *Cabrera* was, why plaintiffs did not file those specific claims and/or this entire case as related, pursuant to D.D.C. Local Civil Rule 40.5(a)(3), given the "common issues of fact," *id.* Rule 40.5(a)(3)(ii), involved in adjudicating the claims, which "grow out of the same event," *id.* Rule 40.5(a)(3)(iii), *i.e.*, the same alleged terrorist attacks.<br><br>Signed by Judge Beryl A. Howell on July 24, 2025. (lcbah2) (Entered: 07/24/2025) |
| 07/25/2025 | | Set/Reset Deadlines: Plaintiff Filing due by 7/29/2025. (mac) (Entered: 07/25/2025) |

| 07/29/2025 | 32 | RESPONSE TO ORDER OF THE COURT re Order,,,,,, filed by ALL PLAINTIFFS. (Cameron, Peter) (Entered: 07/29/2025) |
|---|---|---|
| 07/29/2025 | 33 | NOTICE *OF RELATED CASE* by ALL PLAINTIFFS (Cameron, Peter) (Entered: 07/29/2025) |
| 08/06/2025 | | MINUTE ORDER (paperless) DIRECTING plaintiffs, by August 13, 2025, to: (1) supplement plaintiffs' economic damages estimates to account for probable income taxes, *see, e.g.*, *Hooks v. Washington Sheraton Corp.*, 578 F.2d 313, 317 (D.C. Cir. 1977); *Pennington v. Islamic Republic of Iran*, 2022 WL 18814284 (D.D.C. May 3, 2022); (2) identify the parts of the publicly available record in *Cabrera v. Islamic Republic of Iran*, 19–cv–3835 (JDB) (D.D.C.), that reference or are relevant to the attack on **August 18, 2009**, allegedly resulting in the injuries for which plaintiff **Kevin Deas, Sr.** seeks damages in the instant case, and provide (a) an index to those parts of the *Cabrera* record; (b) a copy of those parts of the *Cabrera* record; and (c) a summary, with citations, to the judicial findings with respect to that attack, including regarding who committed the attack and whether material support from Iran proximately caused the attack; (3) identify the parts of the publicly available record in *Cabrera v. Islamic Republic of Iran*, 19–cv–3835 (JDB) (D.D.C.), that reference or are relevant to the attack on **October 29, 2011**, allegedly resulting in the injuries for which plaintiff **Michael Pabon**, seeks damages in the instant case, and provide (a) an index to those parts of the *Cabrera* record; (b) a copy of those parts of the *Cabrera* record; and (c) a summary, with citations, to the judicial findings with respect to that attack, including regarding who committed the attack and whether material support from Iran proximately caused the attack; and (4) identify the parts of the publicly available record in *Cabrera v. Islamic Republic of Iran*, 19–cv–3835 (JDB) (D.D.C.), that reference or are relevant to the attack on **May 18, 2012**, allegedly resulting in the injuries for which plaintiff **Scott Smith**, seeks damages in the instant case, and provide (a) an index to those parts of the *Cabrera* record; (b) a copy of those parts of the *Cabrera* record; and (c) a summary, with citations, to the judicial findings with respect to that attack, including regarding who committed the attack and whether material support from Iran proximately caused the attack. Signed by Judge Beryl A. Howell on August 6, 2025. (lcbah2) (Entered: 08/06/2025) |
| 08/07/2025 | 34 | NOTICE of Appearance by Floyd Ronald Jenkins, Jr. on behalf of All Plaintiffs (Jenkins, Jr., Floyd) (Entered: 08/07/2025) |
| 08/07/2025 | | Set/Reset Deadlines: Plaintiffs Filing due by 8/13/2025. (mac) (Entered: 08/07/2025) |
| 08/13/2025 | 35 | NOTICE *OF RELATED CASE* by ALL PLAINTIFFS (Cameron, Peter) (Entered: 08/13/2025) |
| 08/13/2025 | 36 | RESPONSE TO ORDER OF THE COURT re Order,,,,,,,,, filed by ALL PLAINTIFFS. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Cameron, Peter) (Entered: 08/13/2025) |

| 08/28/2025 | 37 | ORDER GRANTING plaintiffs' 28 Motion to Take Judicial Notice; and GRANTING in part and DENYING in part plaintiffs' 31 Motion for Default Judgment. See Order for further details. The Clerk of the Court is directed to close this case. Signed by Judge Beryl A. Howell on August 28, 2025. (lcbah2) (Entered: 08/28/2025) |
| --- | --- | --- |
| 08/28/2025 | 38 | MEMORANDUM OPINION regarding plaintiffs' 28 Motion to Take Judicial Notice and plaintiffs' 31 Motion for Default Judgment. Signed by Judge Beryl A. Howell on August 28, 2025. (lcbah2) (Entered: 08/28/2025) |
| 09/09/2025 | 39 | AFFIDAVIT REQUESTING FOREIGN MAILING by ALL PLAINTIFFS. (Attachments: # 1 Exhibit Letter Requesting Foreign Mailing)(Cameron, Peter) (Entered: 09/09/2025) |
| 09/15/2025 | 40 | REQUEST from Plaintiffs for the Clerk to dispatch for mailing one copy of the default judgment, and notice of suit, together with a translation of each into the official language of the foreign state, by FedEx, to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3). (See docket entry 39 to view document) (mg) (Entered: 09/15/2025) |
| 09/23/2025 | 41 | NOTICE of Appearance by Robert L. Sirianni, Jr on behalf of All Plaintiffs (Sirianni, Robert) (Entered: 09/23/2025) |
| 09/25/2025 | 42 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 37 Order on Motion to Take Judicial Notice, Order on Motion for Default Judgment, 38 Memorandum & Opinion by ALL PLAINTIFFS. Fee Status: No Fee Paid. Parties have been notified. (mg) (Entered: 09/25/2025) |
| 09/25/2025 | 43 | ENTERED IN ERROR.....NOTICE *of Appeal* by ALL PLAINTIFFS re 38 Memorandum & Opinion (Sirianni, Robert) Modified on 9/29/2025 (mg). (Entered: 09/25/2025) |
| 09/29/2025 | | NOTICE OF ERROR regarding 43 Notice (Other). The following error(s) need correction: Incorrect document. (mg) (Entered: 09/29/2025) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BAKER, ET AL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CASE NO: 1:22-cv-02765-BAH** |
| v. | ) | |
| | ) | |
| **ISLAMIC REPUBLIC OF IRAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## NOTICE OF APPEAL

---

Notice is hereby given this 25th day of September, 2025, that the following plaintiffs - Johnny Butler, Jr.; Sherita Sanders; Arletha Pettie; Claudia Pettie; Mecko Johnson; Jonathan James Butler; Jaylen Butler; Jada Butler; Grady Horner; Cameron Horner; Daniel Kernan; Lea Ann McCartney; James Kernan; Donald McDaniel, II; Donald McDaniel, Sr.; Shelby McDaniel; James McDaniel; Logan McDaniel; Terasa Defusto; Arik Miller; A.M.; Calandra Bailey; Tyresha Williams; Brandon Paredes; Julie Paredes; Gary Paredes; Jesse Paredes; Adam Paredes; the Estate of Nevaeh Paredes; Evan Pronzati; Andrew Vega; and Maricruz Carrera - hereby appeal to the United States Court of Appeals for the District of Columbia from this judgment entered on August 28, 2025 which was in favor of defendant and against said plaintiffs.

**RECEIVED**

SEP 25 2025

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

*/s/ Robert L. Sirianni, Jr.*
Robert L. Sirianni, Jr., Esquire
DC Bar No. 1016303
PO BOX 2047
Winter Park, FL 32790
(t) 407-388-1900
(f) 407-622-1511
robertsirianni@brownstonelaw.co

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed with

the Clerk of Court via this court's e-filing system on September 25, 2025.

*/s/ Robert L. Sirianni, Jr.*
Robert L. Sirianni, Jr., Esquire
DC Bar No. 1016303

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NAMIG BAKER, *et al.*,

        Plaintiffs,

        v.

ISLAMIC REPUBLIC OF IRAN,

        Defendant.

Civil Action No. 22-2765 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

This action, brought by sixty-one plaintiffs, arises out of sixteen separate terrorist attacks targeting U.S. military personnel that were carried out in Afghanistan between 2008 and 2012. *See* Compl. ¶ 1, ECF No. 1; Pls.' Mot. for Default J. ("Pls.' Mot."), ECF No. 31, Ex. 1, Pls.' Proposed Findings of Fact & Conclusions of Law ("Pls.' Mem.") at 1, 16, ECF No. 31-1. Each of these attacks injured one of the plaintiffs, who were members of the U.S. Armed Forces at the time of the attacks. Compl. ¶ 1. The remaining forty-five plaintiffs are immediate family members of these sixteen injured servicemembers. *Id.* Plaintiffs allege that defendant, the Islamic Republic of Iran ("Iran"), provided "material support and resources" to a "syndicate" of terrorist organizations responsible for these attacks, *id.* ¶¶ 2, 4, and plaintiffs seek damages for their injuries suffered as a result of the attacks, under the Foreign Sovereign Immunities Act's ("FSIA") state-sponsored terrorism exception, 28 U.S.C. § 1605A(c). Plaintiffs have complied with the FSIA's requirements for effectuating service on a defendant, *see id.* § 1608(a)(4), but Iran has failed to enter an appearance or otherwise defend against this action, *see* Return of Service/Aff. of Summons & Complaint Executed, ECF No. 13; Clerk's Entry of Default, ECF No. 15. Plaintiffs now seek the entry of default judgment against Iran as to liability and damages. Pls.' Mot. For

1

the reasons detailed below, plaintiffs' motion for default judgment is granted in part and denied in part.

## I.    LEGAL STANDARD

"Rule 55(a) [of the Federal Rules of Civil Procedure] requires the Clerk to enter a default when a defendant 'has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise,'" and, "[o]nce the Clerk does so, the plaintiff may 'apply to the court for a default judgment' under Rule 55(b)." *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1023 (D.C. Cir. 2020) (quoting FED. R. CIV. P. 55(a), (b)(2)).  Federal Rule of Civil Procedure 55(b)(2) thus permits a court to consider entering a default judgment when a party applies for that relief.  *See* FED. R. CIV. P. 55(b)(2).  At the same time, since "strong policies favor resolution of disputes on their merits[] '[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) (second bracket in original)).  Moreover, the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether the court has subject-matter jurisdiction over the action. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  Consequently, "entry of a default judgment is not automatic." *Id.* at 6 (footnote omitted).

When default judgment is sought under the FSIA, a movant must also "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  This requirement "provides foreign sovereigns a special protection akin to that assured the federal government by

Fed. R. Civ. P. 55([d])." *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. Rep. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under rule 55([d])"); *Klapprott v. United States*, 335 U.S. 601, 611 (1949) (noting that Rule 55(d) "expressly bars all judgments against the United States without proof").

While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, the FSIA's state-sponsored terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047-48 (D.C. Cir. 2014); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019). To this end, the D.C. Circuit has instructed that "courts have the authority— indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (alterations accepted) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)); *see also Klapprott*, 335 U.S. at 611 (observing that "statutes and rules have largely left for judicial determination the type of cases in which hearings and proof should precede default judgments").

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Han Kim*, 774 F.3d at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). Uncontroverted factual allegations that are supported by admissible evidence are taken as true. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus v. Islamic*

*Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010))); *accord* FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when the adverse party "fails to properly address another party's assertion of fact").

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient.'" *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)), as "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory," *Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785). In particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted." *Owens*, 864 F.3d at 785 (second alteration in original) (internal quotation marks omitted) (quoting *Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994)).

## II.    BACKGROUND AND FINDINGS OF FACT

Plaintiffs allege that each of the sixteen terrorist attacks at issue in this litigation were carried out by a "syndicate" of various terrorist organizations, including the Taliban, the Haqqani Network, and Al-Qaeda, that together "planned and authorized terrorist violence throughout Afghanistan," Compl. ¶ 4, including via a collaborative project called the "Kabul Attack Network," *id.* ¶ 85, and that Iran provided "material support and resources" to these organizations as part of its "policy of sponsoring anti-American terrorism in Afghanistan," *id.* ¶¶ 2, 4; *see also id.* ¶¶ 3, 12-13; Pls.' Mem. at 1. As support for these allegations, plaintiffs have submitted reports by two individuals previously certified as experts in other cases and requested that these individuals also be certified as experts in this case. *See* Pls.' Mot., Exs. 78, 79, ECF Nos. 31-3, -4. Plaintiffs have also requested that judicial notice be taken of three other categories of evidence. Pls.' Mot. for

Judicial Notice & Mem. of P. & A. ("Pls.' Judicial Not. Mot."), ECF No. 28.  In reviewing these evidentiary requests, this Court is mindful of "the significant evidentiary challenge in FSIA terrorism cases with a defaulting defendant [] that 'firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign,'" and the problem this poses "for plaintiffs who must gather the evidence . . . regardless of how long ago the attack at issue occurred."  *Maalouf*, 923 F.3d at 1114 (quoting *Owens*, 864 F.3d at 785).

Plaintiffs' evidentiary requests are addressed first before turning to the factual findings supported by the admitted evidence pertaining to Iran's alleged material support to the syndicate of terrorist organizations responsible for the terrorist attacks at issue and the specific evidence as to the individual plaintiffs.

### A.  Plaintiffs' Evidentiary Requests

Plaintiffs request that Dr. Colin Clarke and retired U.S. Army Lt. Col. Steven A. Wood be qualified as experts, respectively, in "Middle Eastern terrorism," Pls.' Mem. at 5 n.2, and in "terror attack attribution analysis," *id.* at 6 n.3, and that their reports be admitted.  *See* Pls.' Mot., Ex. 78, Expert Witness Report of Colin P. Clarke, Ph.D. ("Clarke Report"), ECF No. 31-3; *id.*, Ex. 79, Expert Report of Steven A. Wood, Lt. Col., U.S. Army (Ret.) ("Wood Report"), ECF No. 31-4; Pls.' Sealed Mot. for Default J., ECF No. 29, Ex. 79, Expert Report of Steven A. Wood, Lt. Col., U.S. Army (Ret.) ("Sealed Wood Report"), ECF No. 29-82.[1]  Both of these proffered experts were previously certified as experts in these same subject-matter areas in *Cabrera v. Islamic Republic*

---

[1]    The Wood Report filed on the public docket in this case contains some redactions of both identifying information of attack victims and other information filed under seal in this case.  This public version of the Wood Report is cited herein, except where citation to the Sealed Wood Report is necessary to explain the Court's reasoning.  Likewise, for the same reason, "insofar as [this opinion] refer[s] to information derived from" various other sealed declarations and evidence submitted by plaintiffs, "it is unsealed to the limited extent referenced in this opinion, although the full document shall remain physically withheld from public review."  *United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009); *see also Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955, at *3 n.5 (D.D.C. Aug. 15, 2023).

*of Iran* ("*Cabrera I*"), Nos. 19-cv-3835, 18-cv-2065 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022), another FSIA case filed in this Court against Iran seeking damages for injuries suffered in terrorist attacks against American servicemembers and civilians in Afghanistan. *See* 2022 WL 2817730, at *4-5 (describing the certification as experts of Dr. Clarke and Lt. Col. Wood).

As a general matter, oral or written expert testimony is often admitted and relied upon in terrorism cases brought pursuant to the FSIA. *See, e.g.*, *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 48-49 (D.D.C. 2006) (relying on expert witness testimony to establish Iran's link to the terrorist bombing of the Khobar Towers); *Est. of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229, 253-54 (D.D.C. 2006) (same); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 11-12 (D.D.C. 2018) (Howell, C.J.) (taking judicial notice of the expert witness testimony in *Blais* and *Heiser I* and finding facts based on that testimony); *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888, at *1-3 (D.D.C. June 27, 2019) (same); *Thole v. Islamic Republic of Iran*, No. 23-cv-793 (BAH), 2024 WL 2208208, at *3-4 (D.D.C. May 16, 2024) (same); *Cabrera I,* 2022 WL 2817730, at *3-27 (relying heavily on expert testimony to establish background on terrorist groups in Afghanistan, link them to the attacks at issue in the case, and find that Iran provided material support and resources to these terrorist groups); *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 51 n.1, 52-58 (D.D.C. 2021) (explaining that, "[i]n terrorism cases, expert testimony is often sufficient for plaintiffs to meet their burden," relying extensively on written expert testimony to find "that Iran . . . provided material support in the form of arms, training, funds, and technology" to terrorist groups in Afghanistan, and finding that those terrorist groups committed the attacks at issue in that case).

Both Dr. Clarke and Lt. Col. Wood have extensive experience in the subject-matter areas in which they seek to offer their expertise. *See* Clarke Report at 2-5 (outlining Dr. Clarke's

6

qualifications); Wood Report ¶ 1 (outlining Lt. Col. Wood's qualifications); *see also* Pls.' Mem. at 5 n.2 (briefly summarizing Dr. Clarke's qualifications); *id.* at 6 n.3 (briefly summarizing Lt. Col. Wood's qualifications).

Here, no challenge to the qualifications or opinions of either Dr. Clarke or Lt. Col. Wood has been raised, and after review of both their reports and qualifications, this Court finds that each is qualified as an expert to offer the opinions provided, *see* FED. R. EVID. 702, and that both reports comply with all relevant requirements, *see id.*; FED. R. EVID. 703. Accordingly, Dr. Clarke is qualified to offer his opinions as an expert in Middle Eastern terrorism, and Lt. Col. Wood is qualified to offer his opinions as an expert in terror attack attribution analysis, and their reports will be admitted as evidence in assessing plaintiffs' pending motion for default judgment.

Plaintiffs next request that judicial notice be taken of three additional categories of evidence. "A federal court may take judicial notice of 'a fact that is not subject to reasonable dispute' if it . . . 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (quoting FED. R. EVID. 201(b)). The first category consists of "information regarding Iran's status as a designated state sponsor of terrorism, and terrorist designations of the Afghan Taliban, the Haqqani Network, al-Qaida and their respective members, which are posted on official United States government websites," citing, in particular, three separate official reports of the U.S. Department of State. Pls.' Judicial Not. Mot. at 2-3; *id.*, Ex. E, U.S. Dep't of State, *State Sponsors of Terrorism* ("*Iran Terrorism Designation*"), ECF No. 28-6; *id.*, Ex. F, U.S. Dep't of State, *Foreign Terrorist Organizations* ("*Designated FTOs*"), ECF No. 28-7; *id.*, Ex. G, U.S. Dep't of State, *Executive Order 13224* ("*EO 13224 Terrorist Designations*"), ECF No. 28-8. Under Federal Rule of Evidence 201(b), judicial notice is appropriately taken of information on official public

7

government websites. *See Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 85 (D.C. Cir. 2024) (citing FED. R. EVID. 201(b); FED. R. EVID. 803(8)) (taking judicial notice of government reports); *Citizens for Responsibility & Ethics in Wash. v. Trump*, 924 F.3d 602, 607 (D.C. Cir. 2019) (taking judicial notice of a "[m]emo [that] represent[ed] the White House's official position, [] [wa]s publicly available on the National Archives' website," and whose authenticity was not being challenged); *Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016) (taking judicial notice of a government report); *Kaspersky Lab, Inc. v. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018) (noting that among the sources of information a court may consider "are public records subject to judicial notice" (internal quotation marks omitted) (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)); *Pharm. Rsch. & Mfrs. Ass'n of Am. v. Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33-34 (D.D.C. 2014) (noting that "[c]ourts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies" and collecting cases in support of that proposition). Thus, judicial notice is taken of the official U.S. government reports and websites submitted by plaintiffs.

The second and third categories of information of which plaintiffs ask this Court to take judicial notice are the "key findings of fact and conclusions of law" from *Cabrera I*, 2022 WL 2817730, and *Selig*, 573 F. Supp. 3d 40, Pls.' Judicial Not. Mot. at 1; Pls.' Resp. to Aug. 13, 2025, Minute Order ("Pls. Resp. to MO") at 1-4, ECF No. 36 (specifying attack-specific *Cabrera* findings relevant to the instant case), and the testimony of four experts upon which these findings and conclusions were based, Pls.' Judicial Not. Mot. at 1-2 (requesting notice of the expert testimony of three experts from *Cabrera* and one from *Selig*); Pls.' Resp. to MO at 2. Courts in FSIA cases routinely use Rule 201 to take judicial notice of factual evidence developed in other proceedings "involving the same conduct by the same defendants," *Akins*, 332 F. Supp. 3d at 11,

"even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)).   This avoids "the formality of having that evidence reproduced." *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011) (quoting *Rimkus*, 750 F. Supp. 2d at 172); *see also Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 55 (D.D.C. 2010); *Oveissi v. Islamic Republic of Iran* ("*Oveissi III*"), 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding that courts are permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation" (quoting *Rimkus*, 750 F. Supp. at 163)); *Est. of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (taking "judicial notice of the evidence presented in the earlier cases").

While judicial notice may be taken of evidence submitted in another case, "courts typically cannot take judicial notice of prior proceedings 'for the purpose of accepting the truth of the earlier court's findings and conclusions.'" *Sibley v. Islamic Republic of Iran*, No. 23-cv-600 (JEB), 2025 WL 1928036, at *15 (D.D.C. July 14, 2025) (quoting *Rimkus*, 750 F. Supp. 2d at 171).  Instead, in FSIA litigation, "courts may properly 'rely upon the evidence presented in earlier litigation— without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them.'"  *Id.* (quoting *Rimkus*, 750 F. Supp. 2d at 172); *see also, e.g.*, *Thole*, 2024 WL 2208208, at *2 ("[B]ased on judicial notice of the evidence presented in the earlier cases, courts may reach their own independent findings of fact." (alterations accepted) (quoting *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010))).

Both *Cabrera* and *Selig* required the resolution of some of the same questions of fact present in the instant case.  As plaintiffs explain, the allegations here "involve the same state sponsor, providing material support and resources to the same terrorist organization, in the same

geography, during overlapping timeframes," as those at issue in *Cabrera*, and also involve "attacks targeting U.S. armed forces personnel serving on active duty in Afghanistan." Pls.' Judicial Not. Mot. at 6. The *Cabrera* court held a three-day evidentiary hearing on these issues, at which hearing the plaintiffs in that case introduced extensive evidence about Iran's material support for the terrorist syndicate, 2022 WL 2817730, at *1, 3, including the testimony of three expert witnesses and five fact witnesses, *id.* at *3.[2] Expert reports from each of the three expert witnesses were also admitted, as were numerous other exhibits. *Id.* Based on this record, the *Cabrera* court made extensive and detailed factual findings about the history and operations of the terrorist syndicate in Afghanistan, Iran's provision of material support and resources to the syndicate, and the syndicate's responsibility for eleven "bellwether" attacks. *Id.* at *5. In *Selig,* too, the court considered attacks alleged to have been carried out by the Taliban and Haqqani Network against U.S. citizens in Afghanistan and made findings based on expert testimony. *See* 573 F. Supp. 3d at 51; *see also id.* at 51 n.1 (describing the expert testimony provided). Although the attacks at issue in *Selig* occurred in 2015 and 2018, *id.* at 51, a time period falling outside of that relevant to this case, evidence submitted to the court discussed the relationship between Iran, the Taliban, and the Haqqani Network prior to and during the time period at issue in this case, *see, e.g.*, *id.* at 52-55.

After reviewing the record and the factual findings in both *Cabrera* and *Selig*, this Court is persuaded that taking judicial notice of the evidence presented in both cases about Iran's connection to the terrorist organizations that plaintiffs allege perpetrated the attacks at issue in the instant case is both "efficient and sufficiently protective of the absent defendant['s] interests." *Akins*, 332 F. Supp. 3d at 11. On that basis, plaintiffs' request is granted and judicial notice of the

---

[2]    Both Dr. Clarke and Lt. Col. Wood, the two expert witnesses in the instant case, also served as expert witnesses in *Cabrera*. *See* 2022 WL 2817730, at *4-5. The third expert witness in *Cabrera* was William Roggio, who was qualified as an expert in the field of "Middle Eastern terrorism." *Id.* at *4 (describing Roggio's credentials and testimony).

evidence presented in *Cabrera I*, 2022 WL 2817730, and *Selig*, 573 F. Supp. 3d 40, is taken in this case, though this Court will "reach [its] own independent findings of fact," *Thole*, 2024 WL 2208208, at *2 (quoting *Anderson*, 753 F. Supp. 2d at 75).

### B. Findings of Fact

The relevant evidence in this case, provided in the declarations, exhibits, and expert reports submitted by plaintiffs, as well as in the judicially noticed evidence described above, is summarized below.[3]

Between at least 2006 and 2019, and at all times between 2008 and 2012, the time period relevant to this case, various terrorist groups operating in Afghanistan joined together to form a "terrorist syndicate." Clarke Report at 6. Through this syndicate, these terrorist organizations—most notably, the Taliban, the Haqqani Network, and al-Qaeda—combined efforts to "promote a common interest" of the groups involved: attacking Western and Afghan government targets and killing American troops, with the ultimate goal of "driv[ing] the United States and its allies out of Afghanistan." *Id.* at 5-6; *see also* Pls.' Judicial Not. Mot., Ex. C, Expert Report of William F. Roggio ("Roggio Report") ¶ 23, submitted in *Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-2065 (JDB) (D.D.C. filed Oct. 4, 2021), ECF No. 28-4 at 4 ("The Syndicate's goal was to expel American and Coalition forces from Afghanistan and undermine the newly instituted democratic government of Afghanistan."). During the time period relevant to this case, the syndicate "provided a platform for close strategic, tactical and operational coordination" between the groups participating in the syndicate, Clarke Report at 6, and the syndicate's command-and-

---

[3]      In addition to the two expert reports, which totaled 175 pages, plaintiffs submitted 84 other exhibits, including sealed and redacted versions of declarations from each plaintiff and vocational and economic analyses for ten of the servicemember plaintiffs, along with supporting documentation for each declaration. *See* Pls.' Mem., Index of Exhibits, ECF No. 29-3. The judicially noticed expert reports from *Cabrera* total approximately 480 pages. *Id.*, Ex. 81, Pls.' Expert Reports from *Cabrera*, ECF No. 29-84. Finally, plaintiffs submitted 40 pages of government websites and reports, of which judicial notice is taken. Pls.' Judicial Not. Mot., Exs. E, F, G, ECF Nos. 28-6, -7, -8.

control structure facilitated "financial and resource sharing vertically and horizontally throughout the organization," *id.* at 1; *see also* Roggio Report ¶ 28 ("The Syndicate provided the infrastructure for members to discuss political and terrorist strategies and to funnel resources needed to plan and execute attacks.").   As then-Secretary of State Hillary Clinton explained the U.S. government's view in 2009, the member groups functioned in Afghanistan "not as separate independent operators that occasionally cooperate[d] with one another, but as part of a syndicate of terrorism"; because of this collaboration, their "level of operational cooperation, training, equipping, [and] financing has grown exponentially."  Clarke Report at 6 (quoting *Afghanistan: Assessing the Road Ahead: Hearing Before the S. Comm. on Foreign Rels.*, 111th Cong. 24 (2009) (statement of Sec. Hillary Clinton, U.S. Dep't of State)).

### 1.   Main Groups In Terrorist Syndicate

The main groups forming the alleged terrorist syndicate are discussed below.

#### (a) The Taliban

 The Taliban were founded in Afghanistan by Mullah Mohammed Omar in 1994, five years after the Soviet Union had withdrawn and left a power vacuum in the country.  Clarke Report at 6.  This new group sought "to bring order and discipline to Afghanistan through brute force, augmented by an austere version of Islam."  *Id.*; *see also* Pls.' Judicial Not. Mot., Ex. C, Expert Witness Report of Dr. Colin Clarke ("Clarke *Cabrera* Report") at 6-8, submitted in *Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-2065 (JDB) (D.D.C.) (filed Oct. 4, 2021), ECF No. 28-4 at 180.[4]   To assist in these efforts, the Taliban enlisted the military help of Jalaluddin Haqqani and the experienced fighters he commanded, referred to as the Haqqani Network.  Clarke

---

[4]        While the Clarke Report submitted in the instant case and the Clarke *Cabrera* Report contain the same general information and conclusions, the Clarke *Cabrera* Report provides more fulsome historical context and information.

Report at 6; *see infra* Part II.B.1(b).  In 1995, the Haqqani Network formally joined the Taliban, and in 1996, the Taliban succeeded in capturing the capital city of Kabul and proclaimed a new Islamic Emirate of Afghanistan.  Clarke Report at 6; Roggio Report ¶ 39.  That same year, when Osama bin Laden and the terrorist organization he headed, al-Qaeda, were expelled from Sudan, the Taliban invited al-Qaeda to relocate to Afghanistan.  Clarke Report at 6; *see infra* Part II.B.1(c).

In Afghanistan, "[t]he bond between the Taliban and al-Qaeda grew stronger over the years."  Clarke Report at 6.  Al-Qaeda provided funding and manpower to the Taliban, and in return the Taliban provided al-Qaeda with sanctuary.  *Id.* at 7; *see also* Clarke *Cabrera* Report at 9.  Even after al-Qaeda perpetrated three major international terrorist attacks against the United States—the 1998 bombing of the U.S. embassies in Tanzania and Kenya, the 2000 attack on the *USS Cole*, and the September 11, 2001, attacks—the Taliban refused to expel al-Qaeda or hand bin Laden over to U.S. authorities despite repeated requests from the U.S. government.  Clarke Report at 7; Roggio Report ¶ 42.  In response, shortly after the September 11, 2001, attacks, the United States invaded Afghanistan, "targeting the Taliban's military infrastructure" and seeking to "track down al-Qaeda's top lieutenants."  Clarke Report at 7; *see also* Roggio Report ¶ 42.  The Taliban were "toppled . . . from power within weeks," and many al-Qaeda and Taliban leaders fled across the border to Pakistan, with others fleeing to Iran.  Clarke *Cabrera* Report at 10; Clarke Report at 38.  On July 2, 2002, the United States designated both the Taliban and Mullah Omar as a Specially Designated Global Terror Entity ("SDGTE").  *EO 13224 Terrorist Designations* at 21; Roggio Report ¶ 42.

After regrouping, in 2003 the Taliban formally launched an insurgency against U.S. and North Atlantic Treaty Organization ("NATO") troops, as well as the new, lawful Afghan government.  Clarke Report at 8; Roggio Report ¶¶ 43-44.  To oversee this insurgency, the Taliban

13

established a leadership council, known as the Rahbari Shura (or Quetta Shura), made up of prominent Taliban military commanders, including representatives of the Haqqani Network. Clarke Report at 8. In short, the Rahbari Shura served as "the high command of the insurgency" and the "Taliban's supreme organizing body." *Id.* This council, in turn, began appointing governors in different regions of Afghanistan to oversee and direct Taliban activities in those areas. *Id.* In this power structure, the Rahbari Shura set high-level objectives for the Taliban and its fighters; sometimes organized trainings for fighters; assigned personnel to different roles in the group's structure; and retained the authority to approve major operations. Clarke *Cabrera* Report at 25; Roggio Report ¶¶ 51-54; *see also* Clarke Report at 8. The Rahbari Shura also centralized control over a significant portion of the Taliban's funding and collected funds from and distributed them to different regional subgroups of the Taliban as needed. Clarke *Cabrera* Report at 23; Roggio Report ¶¶ 51-54; *see also* Clarke Report at 8, 47. At the same time, the council did not micromanage the local operational decisions of regional and on-the-ground commanders, which aligned with Taliban leadership's decision to remake the organization into "a decentralized network of fighters and low-level commanders empowered to recruit and find resources locally." Clarke Report at 8 (quoting Mujib Mashal, *How the Taliban Outlasted a Superpower: Tenacity and Carnage*, N.Y. Times (May 26, 2020), https://www.nytimes.com/2020/05/26/world/asia/taliban-afghanistan-war.html [https://perma.cc/5X25-QZFA]). This structure allowed Taliban leadership to "provide[] training to fighters and set[] the broader objectives of the campaign," without having to manage every small operation. Clarke *Cabrera* Report at 23-24 (explaining this structure in more detail and likening the approach to "the U.S. Army's concept of mission command").

14

The Taliban's organizational structure had regional shuras below and reporting to the Rahbari Shura.  Roggio Report ¶ 51.  One such regional shura was the Miranshah Shura, established by the Haqqani Network, which "recognized the Rahbari Shura as the Taliban's top leadership council" in exchange for funding and two seats on the Rahbari Shura.  Clarke Report at 8; *see also infra* Part II.B.1(b).  Other regional shuras included the Peshawar Shura, formed in 2005, and the Mashhad Shura, located in Mashhad, Iran, that was originally established in 2007 as an office of the Rahbari Shura but later established itself as "a regional shura in its own right," although "[t]he Rahbari Shura exercised unchallenged control over the Mashhad Shura until 2014."  Clarke Report at 39-40.

### (b) The Haqqani Network

The Haqqani Network was founded by Jalaluddin Haqqani in the mid-1970s, *see* Clarke Report at 6; Clarke *Cabrera* Report at 16, and his son, Sirajuddin Haqqani, now serves as the network's leader, *see* Wood Report ¶ 62, as well as in a high-level leadership role in the Taliban, *see* Clarke Report at 10-11 (referring to "Sirajuddin Haqqani's role in the Taliban"); Roggio Report ¶ 63 (noting that Sirajuddin "has served as one of the Taliban's two deputy emirs since 2015," and that, in 2016, the chief spokesman for U.S. and NATO forces in Afghanistan described Sirajuddin's role as "increasingly run[ning] the day-to-day military operations for the Taliban").  After formally joining the Taliban in 1995, the Haqqani Network operated as a subgroup of the Taliban, including between 2008 and 2012.  Clarke Report at 6; *see also id.* at 8 (explaining that the Haqqani-established Miranshah Shura "recognized the Rahbari Shura as the Taliban's top leadership council," on which council the Haqqanis were given two seats); Clarke *Cabrera* Report at 20-21 (quoting statements by both the Taliban and Haqqani Network proclaiming the groups' unity).  "During the period between 2007 and 2015, the Haqqani Network established a reputation

for ruthless efficiency, emerging as one of the most lethal elements of the Taliban." Clarke Report

at 9. The Network was also "the first element of the Taliban to embrace suicide bombings" as a

tactic. *Id.* at 13.

The State Department designated the Haqqani Network as an FTO on September 19, 2012.

*Designated FTOs* at 2.[5]

### (c) Al-Qaeda

Al-Qaeda is "a premier international terrorist organization" with the "goal of reviving the

caliphate—the unification of Muslim lands ruled under Islamic Law." Roggio Report ¶ 82.

Originally founded by Osama bin Laden and Abdullah Azzam at the end of the Soviet occupation

of Afghanistan, *id.* ¶ 81, al-Qaeda has maintained a "close" connection with the Haqqani Network

since the former's founding, Clarke Report at 6. Bin Laden and Jalaluddin Haqqani "met and grew

connected" during the fight against the Soviet Union, meaning their relationship extended more

than 30 years. *Id.*

In 1996, al-Qaeda was expelled from Sudan and was invited by the Taliban, with the

support of Jalaluddin Haqqani, to relocate its operations to Afghanistan. *Id.*; Roggio Report ¶ 86.

After relocating to Afghanistan, al-Qaeda provided funding to the Taliban. Clarke Report at 7.

From this new home base, bin Laden issued two fatwas, in 1996 and 1998, declaring war against

---

[5]     Though the State Department designated the Haqqani Network as a terrorist organization separately from the Taliban, *see supra* Part II.B.1(a) (discussing the Taliban's July 2, 2002, designation as an SDGTE), the Haqqani Network nonetheless operates as a part of the Taliban. *See, e.g.*, Clarke Report at 6, 8-9 (explaining that the Haqqani Network formally joined and functioned as part of the Taliban); *id.* at 21 (noting that, "[i]n February 2005, Sirajuddin Haqqani 'identified himself as the head of the Taliban military committee'" overseeing five provinces in Southeastern Afghanistan (quoting Thomas Ruttig, *Loya Paktia's Insurgency, Part I, in* DECODING THE NEW TALIBAN 63 (Antonio Giustozzi ed., 2009)); Roggio Report ¶¶ 61, 63 (explaining Sirajuddin Haqqani's high-level role in the Taliban); *see also id.* ¶ 62 ("The Haqqani Network is an integral part of the Taliban, as reflected by the Haqqani family member's [sic] key leadership roles in the Taliban."); Clarke *Cabrera* Report at 20-21 (noting statements from both the Taliban and Haqqani Network proclaiming that the Haqqanis were part of the Taliban); *see also Cabrera I*, 2022 WL 2817730, at *8 (noting that, despite the separate terrorist designations, the Taliban and the Haqqanis "are one and the same" (quoting from the record)).

the United States.  Clarke Report at 6; Roggio Report ¶¶ 86, 90.  Al-Qaeda also committed three major international terrorist attacks against the United States: the 1998 embassy bombings, the attack on the *USS Cole* in 2000, and the September 11, 2001, attacks.  Clarke Report at 7.  Despite repeated requests in the wake of these attacks, the Taliban refused to hand bin Laden over to the United States or expel him from Afghanistan.  Clarke Report at 7; *see supra* Part II.B.1(a).

At the beginning of the Taliban's insurgency against U.S. and NATO forces, around 2003, al-Qaeda played an important role in helping the Taliban reorganize its forces.  Clarke Report at 7.  As explained by Dr. Clarke, this assistance served as a "force multiplier" that "increased the lethality of Taliban attacks against U.S. troops."  *Id.*  In addition, al-Qaeda provided combat advisors to the Taliban throughout the insurgency, which helped to improve the Taliban's military tactics and introduced and expanded the use of suicide bombing, among other changes.  *Id.* at 7, 13.

The United States designated al-Qaeda as an FTO on October 8, 1999.  *Designated FTOs* at 3.

### (d) The Kabul Attack Network ("KAN")

The KAN was formed in 2004 by the Taliban and Haqqani Network as a terrorist cell to focus on carrying out high-profile attacks in Kabul.  Clarke Report at 9; *see also* Wood Report ¶¶ 43-44; Compl. ¶ 85.  The Taliban and Haqqani Network formed the core of the KAN, and other involved groups included al-Qaeda, Hezb-e-Islami Gulbuddin ("HIG"), Lashkar-e-Taiba ("LeT"), and "various elements of the Pakistani Inter-Services Intelligence."  Clarke Report at 9.  The groups that made up the KAN "pool[ed] . . . resources," including "fighters, weapons, finances, attack expertise, and propaganda," Roggio Report ¶ 117, to achieve their common goal of

perpetrating attacks against Afghan Government and international security and aid targets in and around the Afghan capital, *see* Wood Report ¶ 44; Roggio Report ¶¶ 117-22.

Although KAN has been described as a fourth distinct group in the terrorist syndicate, *see Cabrera I,* 2022 WL 2817730, at *6 (describing the KAN as one of "four major players" in the syndicate); *id.* at *8 (describing the KAN as "another subset of the Taliban and the greater Syndicate"), the record on this point is murky. The Roggio Report, for instance, described the KAN as "an operational manifestation of the terror Syndicate in Afghanistan," Roggio Report ¶¶ 23, 117; *see also* Clarke Report at 9 (identifying the KAN as "a terrorist syndicate" and describing it as an "archetypal example and also among the most operationally active"), and explained that "the Syndicate operates *through* the Kabul Attack Network," Roggio Report ¶ 118 (emphasis supplied), suggesting that the KAN was not one of the groups that *made up* the syndicate but was instead a particular manifestation *of* the syndicate, at least in and around Kabul. The moniker "Kabul Attack Network" itself was assigned by the U.S.-led coalition to describe the "operational manifestation." Roggio Report ¶ 117. As such, the KAN may be best thought of as a project or program of these several terrorist groups, rather than as a separate terrorist group itself.

### 2.    *Iran's Material Support for the Terrorist Syndicate*

"The United States designated Iran as a state sponsor of terrorism in 1984, and that designation has remained in place ever since." *Cabrera I*, 2022 WL 2817730, at *9; *Iran Terrorism Designation* at 2; *see also* Clarke Report at 41. Prior to and during the time period relevant to the attacks at issue in this case, Iran provided material support to the Taliban and its allies, including al-Qaeda. *See* Clarke Report at 40-41; Roggio Report ¶ 149. The primary channel to provide this support is the Iranian Revolutionary Guards Corps ("IRGC"), a special forces branch of the Iranian armed forces, and more specifically the IRGC's Quds Force, "an elite special operations unit" of the IRGC. Clarke Report at 41. "In 2008, the U.S. State Department concluded

that Iran had been providing material support to the Taliban through its Quds Force since at least 2006," *id.* (citing Off. of the Coordinator for Counterterrorism, U.S. Dep't of State, *2007 Country Reports on Terrorism* (2008)), and in 2019, the U.S. Defense Intelligence Agency reported that "Iran has provided calibrated support—including weapons, training, and funding—to the Taliban to," in part, "counter U.S. and Western influence in Afghanistan" "[s]ince at least 2007," *id.* (quoting U.S. Def. Intel. Agency, *Iran Military Power* 63 (2019). The Supreme Leader of Iran is the commander-in-chief of the IRGC, and Dr. Clarke concluded that "[i]t is impossible that the IRGC and Quds Force could have channeled material support and resources to the Syndicate" as described "without the blessing of Iran's Supreme Leader." *Id.*

Relevant to the resolution of the claims at issue in this case is Iran's provision of financial support to the Taliban. Through the Quds Force, Iran provided funding to the Taliban to support its attacks on U.S. forces. *Id.* at 46. In 2010, some news sources reported that Iran had further incentivized and supported such attacks by placing bounties on U.S. troops, agreeing to pay the Taliban "$1,000 for every American soldier killed in Afghanistan and $6,000 for the destruction of each U.S. military vehicle." *Id.* at 47. Iranian funding was received by Taliban leadership and distributed throughout the organization. *Id.* During the five-month period between April and September 2010, for instance, the Taliban's treasurer distributed more than $75,000 in Iranian funds to syndicate fighters. *Id.*[6]

---

[6]    Plaintiffs also present evidence that Iran provided material support to the Taliban in other ways, such as the provision of weapons, funding, safe haven, and support for drug trafficking operations. *See* Clarke Report at 42-55. As discussed more fully *infra* in Part III.A.2, these other alleged forms of Iranian material support to the Taliban are not relied upon to resolve this case. In light of the "decentralized" structure of both the Taliban and the terrorist syndicate, Clarke Report at 1, 8, the factual record is unclear as to which parts of the Taliban received these other types of material support from Iran and whether the benefits were passed on to all relevant parts of the organization, including those parts that may be responsible for the attacks at issue in this case. *See Sibley*, 2025 WL 1928036, at *10-14 (explaining problems with finding that material support provided to one part of a decentralized organization automatically increased the entire organization's operational capacity, when no evidence was provided to demonstrate how that material support was transferred to other parts of the organization). In any event, the evidence provided

### 3. The Instant Plaintiffs Injured in Terrorist Attacks at Issue

The sixty-one plaintiffs in this case fall into two groups: one group consisting of the eight servicemember plaintiffs who suffered injuries in terrorist attacks that also resulted in fatalities, as well as their family members, and the other group consisting of the eight servicemember plaintiffs who suffered injuries in terrorist attacks that did not result in fatalities, as well as their family members. *See* Pls.' Mem. at 7-9. Since subject matter jurisdiction is lacking to adjudicate the claims of the thirty-one plaintiffs falling into the second group, for reasons explained, *infra* Part III.A.1, the factual background discussed below relates only to the claims of the remaining thirty plaintiffs.[7]

The thirty remaining plaintiffs—eight servicemember plaintiffs and their associated twenty-two family members—base their claims for relief on eight separate terrorist attacks, each of which injured one of the servicemember plaintiffs. These eight attacks are described below, along with the plaintiffs asserting claims based on each attack.

#### (a) June 2, 2011, IED Attack in Zabul Province – Servicemember Plaintiff Namig Baker and His Four Family Member Plaintiffs

On June 2, 2011, plaintiff Namig Baker was serving on active duty as a Private First Class in the U.S. Army in the Zabul Province of Southeastern Afghanistan. Decl. of Pl. Namig Baker

---

about Iran's financial support is sufficient for plaintiffs to establish the required causation, obviating the need to undertake an analysis as to the other types of material support alleged.

[7]    Specifically, the following eight alleged attacks at issue did not result in any fatalities: the May 6, 2011, attack in Ghazni Province, Pls.' Mem. at 17-18; the August 23, 2011, attack in Wardok Province, *id.* at 18-19; the July 28, 2010, attack in Zabul Province, *id.* at 19; the June 4, 2011, attack in Kandahar Province, *id.* at 21-22; the January 8, 2010, attack in Kandahar Province, *id.* at 22; the January 1, 2010, attack in Khost Province, *id.* at 24-25; the May 30, 2010, attack in Kunar Province, *id.* at 28; and the April 4, 2012, attack in Nangarhar Province, *id.* at 28-29. Thus, the claims of the following thirty-one plaintiffs stemming from those eight attacks will be dismissed for lack of subject-matter jurisdiction: Johnny Butler, Jr.; Sherita Sanders; Arletha Pettie; Claudia Pettie; Mecko Johnson; Jonathan James Butler; Jaylen Butler; Jada Butler; Grady Horner; Cameron Horner; Daniel Kernan; Lea Ann McCartney; James Kernan; Donald McDaniel, II; Donald McDaniel, Sr.; Shelby McDaniel; James McDaniel; Logan McDaniel; Terasa Defusto; Arik Miller; A.M.; Calandra Bailey; Tyresha Williams; Brandon Paredes; Julie Paredes; Gary Paredes; Jesse Paredes; Adam Paredes; the Estate of Nevaeh Paredes; Evan Pronzati; and Andrew Vega. *See infra* Part III.A.1.

("Baker Decl.") ¶¶ 1-3, ECF No. 29-4.  While he was driving a Stryker vehicle back to Forward Operating Base (FOB) Bullard, an improvised explosive device (IED) detonated beneath his armored vehicle, destroying the vehicle and rendering him unconscious for five to ten minutes.  *Id.* ¶¶ 4-5.  After regaining consciousness, Private Baker cut himself out of his seatbelt and attended to other members of his squad with severe injuries, despite "passing in and out of consciousness" and suffering "excruciating" pain in his head and "profound" ringing in his ears, before eventually being evacuated by helicopter and taken to a U.S. Army medical facility.  *Id.* ¶¶ 6-8.  The attack killed another member of Private Baker's squad.  *Id.* ¶ 9.

Based on the evidence submitted, the Court finds this attack was committed by the Taliban. The location and time period of an attack are two crucial factors in attack attribution.  In fact, because "[i]n many areas of Afghanistan, only one terrorist group was active—or a particular terrorist group was largely dominant—at any given time," these two factors alone can "indicat[e] likely responsibility for any terrorist attack in that area."  Wood Report ¶ 6; *see also* Clarke Report at 17.  Though no evidence submitted indicates that the Taliban claimed responsibility for this attack or that the U.S. government formally attributed this attack to the Taliban, at the time this attack was committed, the Taliban were "very likely the dominant insurgent group" in Zabul Province, while other insurgent groups were active in other parts of Afghanistan but not present in the Zabul Province.  Clarke Report at 31; *see also* Wood Report ¶ 205.  Indeed, the Taliban claimed responsibility for a number of other attacks in this area between 2008 and 2012.  Clarke Report at 30-31; Wood Report ¶ 205.  Although most of the evidence relied upon by Dr. Clarke and Lt. Col. Wood focuses on attacks that took place in 2009 and 2010, rather than in 2011, Lt. Col. Wood cites an article that implies the Taliban committed a June 2011 attack in the area, Wood Report ¶ 205 n.256, and he notes a 2013 attack for which the Taliban claimed responsibility, *id.* ¶ 205 n.257.

Significantly, the attack that injured Private Baker was "likely" carried out using a pressure plate improvised explosive device ("IED"), a type of device commonly used by the Taliban in attacks against American and coalition military targets in the Zabul Province. Wood Report ¶¶ 206-08. This evidence is sufficient to satisfy plaintiffs' evidentiary burden to show the Taliban was responsible for this terrorist attack injuring Private Baker.

### (b) August 18, 2009, IED Attack in Kandahar Province – Servicemember Plaintiff Kevin Deas, Sr., and His Three Family Member Plaintiffs

On August 18, 2009, plaintiff Kevin Deas, Sr., was serving on active duty as a Staff Sergeant in the U.S. Army and was stationed in the Kandahar Province in Southern Afghanistan. Decl. of Pl. Kevin Deas, Sr. ("Deas Decl.") ¶¶ 1-4, ECF No. 29-17. While he was on foot patrol in the town of Buyana, a five-hundred-pound homemade improvised explosive device ("HME") exploded roughly ten to thirty feet behind him. *Id.* ¶ 4. The force of the explosion "slammed [his] body and head into a mud wall." *Id.* After he "came to," he had "balance problems" and a shrapnel wound in his left shoulder but still returned fire. *Id.* The attack killed another member of his team. *Id.* ¶ 5.

Based on the evidence submitted, the Court finds this attack was committed by the Taliban.[8] Notably, the U.S. government attributed this attack to the Taliban. Wood Report ¶ 274. Additionally, during the time period relevant to this case, "[t]he Taliban Led Syndicate was the dominant terrorist group in this region." *Id.* ¶ 242; Clarke Report at 18-19. One demonstration of this dominance is that the Taliban claimed responsibility for numerous other attacks against U.S. and NATO troops in this region in close proximity to this attack. *See* Clarke Report at 18-19. Moreover, the Taliban originated in the Kandahar Province, and this area remained the "center of

---

[8]    The *Cabrera* court found that this same attack was committed by the Taliban-led syndicate. *Cabrera v. Islamic Republic of Iran* ("*Cabrera II*"), No. 19-cv-3835 (JDB), 2024 WL 3225942, at *6 (D.D.C. June 28, 2024).

22

gravity" for the Taliban's efforts in Afghanistan at the time of this attack, *id.* at 18 (quoting Carl Forsberg, Inst. for the Study of War, *The Taliban's Campaign for Kandahar* 6 (2009)); Wood Report ¶ 243, when the Taliban had "establish[ed] control" over the area and "dramatically increased [its] ability to wage a campaign of intimidation and terror in Kandahar City in 2008 and 2009," Forsberg, *supra*, at 7.  Moreover, Lt. Col. Wood characterized this attack as "a combination of small unit ambushes initiated by improvised explosive devices," Wood Report ¶ 271, and described the tactics, techniques, and procedures used to carry out the attack as "common" tactics used by the Taliban, *id.* ¶ 272.  This evidence is sufficient to satisfy plaintiffs' evidentiary burden to show the Taliban was responsible for this terrorist attack injuring Staff Sergeant Deas.

### (c) July 5, 2010, IED Attack in Kandahar Province – Servicemember Plaintiff Christopher Hardesty and His Three Family Member Plaintiffs

On July 5, 2010, Christopher Hardesty was serving on active duty as a Specialist in the U.S. Army in the Kandahar Province of Southern Afghanistan.  Decl. of Pl. Christopher Robert Hardesty ("Hardesty Decl.") ¶¶ 1-4, ECF No. 29-23.  While he was on patrol, an underground IED, loaded with 500 pounds of explosives, exploded under the Mine-Resistant Ambush Protected All-Terrain Vehicle ("M-ATV") on which Specialist Hardesty was stationed as a gunner.  *Id.* ¶¶ 4-5.  Specialist Hardesty lost consciousness, was pulled out of the vehicle by other members of his unit, and was later evacuated by helicopter.  *Id.* ¶¶ 6-7.  Two members of Specialist Hardesty's unit were killed in the attack.  *Id.* ¶ 7.

Based on the evidence provided, the Court finds this attack was committed by the Taliban. As already discussed, the Taliban were the dominant terrorist group in the Kandahar Province during the time this attack was committed.  *See supra* Part II.B.3(b).  In particular, "[t]he Taliban was very active in Kandahar in the weeks leading up to the IED attack" that injured Specialist Hardesty, carrying out two different ground assaults, one on an airbase and one on an Afghan

23

National Police training base, in the preceding two months.  Wood Report ¶ 291.  Moreover, the IED used in the attack was a radio controlled IED that was "armed by a 180-meter cord attached to a cell phone," a type of explosive that was "sophisticated and unusual in Kandahar Province" at the time of the attack and was a tactic of the Taliban-led syndicate.  *Id.* ¶¶ 293-94.

### (d) August 18, 2011, Vehicle Borne Suicide Bombing Attack in Paktia Province – Servicemember Plaintiff John Iasiello

On August 18, 2011, John Iasiello was serving on active duty as a Specialist in the U.S. Army in the Paktia Province of eastern Afghanistan.  Decl. of Pl. John Albert Iasiello ("Iasiello Decl.") ¶¶ 1-4, ECF No. 29-30.[9]  At approximately 6:45 AM, while Specialist Iasiello was sleeping in a large plywood hut roughly 1,200 feet away from the gated entrance to Forward Operating Base ("FOB") Gardez, a suicide bomber drove a truck carrying a vehicle-borne IED ("SVBIED") into the gate of FOB Gardez.  *Id.* ¶ 4.  When the 7,000 kilogram (approximately 15,000 pound) bomb exploded, debris flew through the air, with some striking Specialist Iasiello "in the back of the head and cut[ting] it open."  *Id.*  Specialist Iasiello was thrown to the ground, where he hit his head "forcefully" and lost consciousness.  *Id.*  Upon regaining consciousness, Specialist Iasiello was in "extreme pain," his ears were ringing, and he could not hear well, and he realized he had multiple other injuries.  *Id.* ¶ 5.  Still, he helped another soldier secure a heavy gun and prepare for a potential follow-up attack until the soldiers were informed that the immediate threat had subsided.  *Id.*  The attack killed two security guards at FOB Gardez.  *Id.* ¶ 4.

---

[9]    Conflicting information has been submitted regarding the province where this attack occurred.  *Compare* Iasiello Decl. ¶ 3 (attesting that the attack occurred at "Forward Operating Base (FOB) Gardez in the Eastern Paktika Province, Afghanistan"), *with* Pls.' Mem. at 23 (stating attack occurred at FOB Gardez in the Paktia Province); Wood Report ¶ 162 (same).  Official Department of Defense documents confirm the location of FOB Gardez in the Paktia Province.  *See, e.g.*, *Military Deployment Periodic Occupational & Env't Monitoring Summary (POEMS): FOB Gardez & Vicinity, Afghanistan*, U.S. Dep't of Def. (Sep. 21, 2012), https://ph.health.mil/PHC%20Resource%20Library/U_AFG_Gardez%20POEMS%202003-2010.pdf ("FOB Gardez is located in the Paktia Province of eastern Afghanistan, near the city of Gardez.").

Based on the evidence presented, the Court finds this attack was committed by the Taliban's Haqqani Network.  Significantly, the Taliban claimed responsibility for the attack and provided specific details about the attack, including the name of the bomber, the province where the bomber was from, and the weight of the explosives involved, all of which confirms the Haqqani Network's responsibility for the attack.  *See* Wood Report ¶¶ 166-67.  Both experts noted that "Taliban claims of responsibility are typically an accurate indicator of Taliban involvement in an attack."  Clarke Report at 17; Wood Report ¶ 157 ("Taliban claims of responsibility are usually accurate, if exaggerated, particularly when the attack was likely to garner significant Afghan or international media attention . . . .").  Both plaintiff experts also attest that at the time of this attack, and at all times between 2008 and 2012, the Paktia Province was a "stronghold" of the Haqqani Network, Clarke Report at 21; *see also* Wood Report ¶ 30, and the Haqqani Network was the dominant terrorist group in this part of Afghanistan, Clarke Report at 23.

### (e) November 27, 2010, Suicide Vest Attack in Paktika Province – Servicemember Plaintiff Joseph Sandlin and His Family Member Plaintiff

On November 27, 2010, Joseph Sandlin was serving on active duty as a Sergeant in the U.S. Army, deployed to FOB Rushmore in the Paktika Province of eastern Afghanistan, where part of his role was working with Afghan uniform police officers.  Decl. of Pl. Joseph Sandlin ("Sandlin Decl.") ¶¶ 2, 4, 6-7, 10, ECF No. 29-60.  That morning, a suicide bomber detonated a bomb at the Afghan police headquarters.  *See* Wood Report ¶ 152; Sandlin Decl. ¶ 11.  As Sergeant Sandlin was responding to this attack and coordinating a plan of action to guard against the potential danger of another attack, a second suicide bomber detonated a bomb about 20 feet away from Sergeant Sandlin.  Sandlin Decl. ¶ 11.  The force of this explosion threw Sergeant Sandlin to the ground and knocked him unconscious for roughly fifteen minutes.  *Id.*  Upon regaining consciousness, he was dazed, had shrapnel in his hip, could not hear, and had blurry vision.  *Id.*

25

The explosion killed more than ten Afghan people. *See id.* ¶ 12 (reporting that 11 Afghans were killed); Wood Report ¶ 148 (stating that 12 Afghan police officers were killed).

Based on the evidence presented, the Court finds this attack was committed by the Taliban's Haqqani Network. Significantly, the Taliban claimed responsibility for this attack, Wood Report ¶ 157, and such claims of responsibility for an attack are typically an accurate indicator of involvement, *id.*; Clarke Report at 17. Moreover, this claim of responsibility is consistent with the experts' opinions that at the time of this attack, and at all times between 2008 and 2012, the Paktika Province was a "stronghold" of the Haqqani Network, Clarke Report at 21; Wood Report ¶ 30, which was the dominant terrorist group in this part of Afghanistan, Clarke Report at 25, though at least one other terrorist group was active nearby, *id.* at 22. In addition, the Haqqani Network "commonly used suicide bombers to attack American and Afghan forces," including by dressing the bombers in civilian clothes, Wood Report ¶ 154, further bolstering the claimed responsibility for this attack.

### (f) October 29, 2011, Vehicle Borne Suicide Bombing Attack in Kabul Province – Servicemember Plaintiff Michael Pabon and His Two Family Member Plaintiffs

On October 29, 2011, Michael Pabon was serving on active duty as a Sergeant in the U.S. Army, deployed to FOB Phoenix in Kabul Province, Afghanistan. Decl. of Pl. Michael Andrew Pabon ("Pabon Decl.") ¶¶ 1, 3-4, 6, ECF No. 29-48. That day, he was positioned as a gunner on the rear of a vehicle that was part of a convey in Kabul. *Id.* ¶ 6. A vehicle-born IED ("VBIED") containing 1,600 pounds of explosives detonated next to the vehicle ahead of Sergeant Pabon's in the convoy. *Id.* The force of the explosion slammed his head against the side of his vehicle, and he lost consciousness. *Id.* While drifting in and out of consciousness, he felt pain in his head, neck, shoulder, and back. *Id.* More than ten people were killed in the attack. *Id.* ¶ 7 (stating that "12 Americans, both contractors and military personnel," were killed in the attack); Wood Report

¶ 170 (stating that the attack "killed five American soldiers, eight American contractors and four Afghan civilians").

Based on the evidence presented, the Court finds that the terrorist syndicate's Kabul Attack Network, led by the Haqqani Network and Taliban, committed this attack.[10]  Significantly, the Taliban claimed responsibility for the attack and provided specific information about the bombing, Wood Report ¶¶ 182-83, and the U.S. government attributed the attack to the Taliban, *id.* ¶ 184. At the time of this attack and throughout the years between 2008 and 2012, "the Taliban and its allies very likely faced no challenges to its area of operations dominance" in Kabul from other insurgent groups.  Clarke Report at 36-37.  During this period, the KAN committed "all sophisticated attacks[] within Kabul at the time of this attack," Wood Report ¶ 174, and the attack that injured Sergeant Pabon qualifies as a sophisticated attack because the attack "required a vehicle, a suicide bomber, and improvised explosives, in addition to planning and coordinating various personnel." *Id.*  Moreover, the type of explosive likely used in the attack was the type of explosive often used by the Haqqani Network as part of the KAN.  *Id.* ¶¶ 176-80.

### (g) May 18, 2012, Explosion Attack in Kunar Province – Servicemember Plaintiff Scott Smith and His Two Family Member Plaintiffs

On May 18, 2012, Scott Smith was serving on active duty as a Specialist in the U.S. Army, stationed at FOB Bostick in the Kunar Province of eastern Afghanistan.  Decl. of Pl. Scott Smith ("Smith Decl.") ¶¶ 2-3, 6, ECF No. 29-64.  That morning, Specialist Smith was working at his desk when he heard an explosion, which was followed first by warning sirens and then by "subsequent mortar blasts." *Id.* ¶ 6.  The first explosion threw him across the room, where his head and shoulder slammed into a door. *Id.* ¶ 7.  After losing consciousness for "a second," he

---

[10]    The *Cabrera* court also found that the syndicate committed this attack.  *Cabrera I*, 2022 WL 2817730, at *21.

experienced "excruciating head, shoulder, neck, back, hand, and wrist pain." *Id.* When he tried to prepare himself by picking up his rifle, a fellow soldier informed him that his eye was "severely damaged and hanging loose out of the socket." *Id.* Around him, he saw others suffering "horrific injuries." *Id.* ¶ 9. Soon, the impact of the blast "took a toll" on him, and he started "vomiting uncontrollably," while another soldier noticed that he was leaking spinal fluid out of his ear. *Id.* ¶ 10. He refused evacuation and stayed on bed rest for two weeks, but when he passed out in front of another soldier, he was evacuated to undergo a CT scan. *Id.* Two American soldiers were killed in this attack. *Id.* ¶ 26; Wood Report ¶¶ 77, 83.

Based on the evidence presented, the Court finds that the Taliban-led syndicate committed this attack.[11] Significantly, "a local spokesman for the International Security Assistance Force (ISAF) attributed the . . . attack to the Taliban." Wood Report ¶ 97. This may be considered an official government attribution of responsibility for the attack. Indeed, "[t]he Taliban-led Syndicate used indirect fire at FOB Bostick so frequently that Coalition forces maintained constant watch" on launch sites that had frequently been used. *Id.* ¶ 91. Moreover, the Taliban became the dominant insurgent group in the Kunar Province in March 2005, when the Taliban managed to convince a number of the members of a rival insurgent group, the HIG, to join the Taliban's Peshawar Shura instead. Clarke Report at 31-32; *see also* Wood Report ¶ 89. Throughout the time period relevant to this case, the Taliban claimed responsibility for a number of attacks in Kunar. Clarke Report at 32.

---

[11] The *Cabrera* court also found that this attack was committed by the Taliban. *Cabrera II*, 2024 WL 3225942, at *6.

### (h) September 17, 2008, Complex Attack in Kunar Province – Servicemember Plaintiff Ryan Winston and His Seven Family Member Plaintiffs

On September 17, 2008, Ryan Winston was serving as a Staff Sergeant on active duty in the U.S. Army, stationed in the Kunar Province in eastern Afghanistan. Decl. of Pl. Ryan Winston ("Winston Decl.") ¶¶ 2, 4, 7, 9, ECF No. 29-70. Before the attack, the base where he was stationed had received intelligence that the area was "densely populated" with Taliban fighters who were "preparing for an attack." *Id.* ¶ 8. On the day of the attack, Staff Sergeant Winston and a group of other soldiers were on a patrol at a village in the area. *Id.* ¶ 9. The group saw a "young boy pacing back and forth in a wooded area" and assumed the boy was a lookout for the Taliban. *Id.* ¶ 10. Right before they left the area, they saw the boy "grab a cell phone." *Id.* ¶ 11. As they drove back to their base, Staff Sergeant Winston was stationed in the second vehicle in his convoy. *Id.* The gunner in his vehicle "reported that the lead vehicle was taking small arms fire from the enemy," and moments later was shot and killed, falling into Staff Sergeant Winston's lap. *Id.* An RPG then struck Staff Sergeant Winston's vehicle and exploded, killing everyone in the vehicle except for Staff Sergeant Winston, who was knocked unconscious. *Id.* ¶ 12. Another team of soldiers managed to pull him out of the vehicle while the attack was ongoing and propped him against a Humvee, where he was shot three times. *Id.* ¶ 13. He called in air support and then "passed out again." *Id.* In total, four U.S. soldiers were killed in the attack. *See id.* ¶ 12; Wood Report ¶ 123. After the attack, Staff Sergeant Winston regained consciousness "in a completely different part of Afghanistan," where he had been "rushed to a hospital for an emergency transfusion due to severe blood loss." Winston Decl. ¶ 14.

Based on the evidence presented, the Court finds that the Taliban-led syndicate committed this attack. Significantly, the weapons used and the "large number of insurgent fighters was consistent with the American intelligence reports of the Taliban preparing an attack," Wood Report

29

¶ 131(u)—which intelligence was referenced by Staff Sergeant Winston in his declaration, *see* Winston Decl. ¶ 8.  Moreover, as previously discussed, *see supra* Part II.B.3(g), the Taliban were the dominant terrorist group in the Kunar Province at the time of this attack, *see* Clarke Report at 31-32; Wood Report ¶ 124, and the attack was consistent in execution with the Taliban-led syndicate's frequent use of young people as scouts to inform them about the movements of U.S. forces, Wood Report ¶ 126.

### C. Procedural History

Plaintiffs filed this lawsuit against Iran on September 13, 2022.  *See* Compl.  Iran was properly served with process in accordance with the FSIA, 28 U.S.C. § 1608(a), which provides the procedure for effectuating service upon a foreign state.  *See* Return of Service/Aff. of Summons & Complaint Executed; *see infra* Part III.B.  After Iran failed to appear, the Clerk's Office entered default against Iran, on May 15, 2023.  Clerk's Entry of Default, ECF No. 15.  Plaintiffs then filed a notice of intent to apply for entry of default judgment by November 11, 2023,  Pls.' Notice of Intent to Apply for Entry of Default Judgment at 1, ECF No. 16, which notice was subsequently updated five times, *see* Pls.' Notice of Revised Intent to Apply for Entry of Default Judgment, ECF No. 17 (anticipating filing by March 8, 2024); Pls.' Notice of Revised Intent to Apply for Entry of Default Judgment, ECF No. 19 (anticipating filing by April 19, 2024); Pls.' Notice of Revised Intent to Apply for Entry of Default Judgment, ECF No. 20 (anticipating filing by June 7, 2024); Pls.' Notice of Revised Intent to Apply for Entry of Default Judgment, ECF No. 25 (anticipating filing by September 27, 2024); Pls.' Notice of Revised Intent to Apply for Entry of Default Judgment, ECF No. 26 (anticipating filing by October 4, 2024).

In October 2024, plaintiffs moved for default judgment, *see* Pls.' Sealed Mot. for Default J.; Pls.' Mot., accompanied by supporting declarations, exhibits, and expert reports, and additionally moved for the Court to take judicial notice of certain evidence, including evidence

30

and judicial findings from *Cabrera* and *Selig*, as well as certain information on public government websites, *see* Pls.' Judicial Not. Mot.  Plaintiffs' motion for default judgment is now ripe for resolution.

## III.    DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendant, (3) the plaintiffs have presented sufficient evidence to establish their claims against the defendant, and (4) the plaintiffs have sufficiently proven that they are entitled to the monetary damages they seek.  These requirements are addressed in order below.

### A.  Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" seeking "relief in personam with respect to which the foreign state is not entitled to immunity either under [the FSIA]."  28 U.S.C. § 1330(a).  Plaintiffs here seek *in personam* relief, raising the key question whether Iran is entitled to immunity under the "state sponsor of terrorism" exception to the FSIA set forth in Section 1605A.[12]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015) (citing 18 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13-14; *see also Doe v. Taliban*, 101 F.4th 1, 8 (D.C. Cir. 2024).  Among those exceptions is the terrorism exception, which provides that:

---

[12]    This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and defendant has "forfeited its affirmative defense . . . by failing to raise it in" this Court, *Owens*, 864 F.3d at 805; *see also Maalouf*, 923 F.3d at 1115 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such an act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  Plaintiffs here assert jurisdiction under this provision, *see* Compl. ¶ 7, on grounds that each of the terrorist attacks resulting in injuries to plaintiffs were "acts of extrajudicial killing" for which Iran provided material support or resources, *id.* ¶ 113 ("Iran provided material support or resources for the acts of extrajudicial killing that injured Plaintiffs and attempted to kill Plaintiffs by providing (among other things) weapons, explosives, and lethal substances to the Taliban.").

For subject-matter jurisdiction to exist on this basis, plaintiffs must show that their personal injuries were "caused by . . . the provision of material support or resources for" an "extrajudicial killing," and that this support was provided by "an official, employee, or agent" of defendant while acting within the scope of an official position.  28 U.S.C. § 1605A(a)(1).  Additional requirements established by 28 U.S.C. § 1605A(a)(2) must also be satisfied: that defendant was a designated state sponsor of terrorism at the time the extrajudicial killings at issue occurred and at the time this lawsuit was filed, *id.* § 1605A(a)(2)(A)(i)(I), and that "the claimant or victim was, at the time" of the extrajudicial killing at issue, a United States national, a member of the armed forces, or a U.S. government employee or contractor, *id.* § 1605A(a)(2)(A)(ii); *see Oveissi v. Islamic Republic of Iran* ("*Oveissi I*"), 573 F.3d 835, 839-40 (D.C. Cir. 2009) (noting that the FSIA terrorism exception applies when, *inter alia*, "'the claimant or victim was a national of the United States,'" and applied where victim of extrajudicial killing was Iranian national "and the claimant . . . is a U.S. citizen")

(quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004))).

Only some of the plaintiffs satisfy all of these requirements. As has already been found, Iran provided material support to the Taliban in the form of funding, at a minimum, and this support was provided by members of the IRGC and Quds Force. *See supra* Part II.B.2. Furthermore, Iran was designated a state sponsor of terrorism in 1984, more than twenty years before any of the attacks at issue in this case occurred, and has continuously remained designated as a state sponsor of terrorism since. *See Iran Terrorism Designation*. Moreover, all the plaintiffs have averred in sworn declarations that they were U.S. citizens at the time of the attacks on which each bases their claims. Finally, each plaintiff alleges suffering a personal injury and seeks money damages. *See* Compl. ¶¶ 245-52; Pls.' Mem. at 2 (seeking "compensatory and punitive damages").

Two of the requirements for subject-matter jurisdiction require more in-depth consideration: the requirement of an extrajudicial killing, and whether Iran's provision of material support to the Taliban caused the attacks at issue in this case. These jurisdictional requirements are addressed *seriatim*.

### 1.    Extrajudicial Killing

For a terrorist attack to qualify as an extrajudicial killing, the attack must kill someone. *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1060-61 (D.C. Cir. 2024) ("Because the perpetrator did not kill anyone in the attack that injured the [plaintiffs], no extrajudicial killing occurred . . . . The [plaintiffs]' injuries were not 'caused by an act of extrajudicial killing' because the terrorist attack that injured them did not kill anyone." (alteration accepted) (quoting 28 U.S.C. § 1605A(a)(1))). "The word 'killing' refers to an action resulting in the death of another." *Id.* at 1061. Here, thirty of the sixty-one plaintiffs—eight servicemember plaintiffs and twenty-two

33

family member plaintiffs—have shown, through sworn declarations, that the terrorist attacks that injured them each resulted in at least one fatality either of a U.S. servicemember or a foreign national, and thus the extrajudicial killing requirement is satisfied as to those thirty plaintiffs. *See supra* Part II.B.3.

The remaining thirty-one plaintiffs—eight servicemember plaintiffs and twenty-three family member plaintiffs—concede that the attacks on which their claims are based resulted in no extrajudicial killing, as required by the FSIA's state-sponsored terrorism exception. Pls.' Mem. at 8-11. Nevertheless, these thirty-one plaintiffs argue that the requirement of an extrajudicial killing should be deemed met because the attacks that caused their injuries were part of "a closely related series of terrorist attacks that [were] part of a larger terrorist campaign backed by the same state sponsor and executed by the same terrorist group," meaning that the entire campaign should be "treated as a single macro-attack" rather than treating all of the individual incidents as "different micro-attacks," and thus that any death caused by any of the attacks in the larger campaign satisfies the extrajudicial killing requirement for all attacks in the campaign. *Id.* at 10. While understandable that these thirty-one plaintiffs seek compensation for the injuries they suffered, this proposed reframing of what constitutes an "act of extrajudicial killing" stretches far beyond what a fair reading of the terrorism exception can support and is therefore rejected.

Each attack, whether closely connected to other attacks or not, was a separate act. *See Act*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/act [https://perma.cc/JP8D -YLPW] (last visited August 3, 2025) (defining "act" as "the doing of a thing"); *Attack*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/attack [https://perma.cc/M6XF-2R JY] (last visited July 27, 2025) (defining "attack" as "the *act* of attacking with physical force" or "a belligerent or antagonistic *action*" (emphasis supplied)). Each was a separate and distinct

34

occurrence, set apart from other attacks by time (sometimes months or years), location, the weapons and tactics used, and other specific facts. *See supra* Part II.B.3. Plaintiffs themselves implicitly recognize this reality by describing each of the terrorist attacks at issue in this case as "part of a larger terrorist campaign." Pls.' Mem. at 10. Turning again to the dictionary, a "campaign" is "a connected series of military operations forming a distinct phase of a war," *see Campaign*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/campaign [https://perma.cc/VDH5-6K6S] (last visited July 27, 2025), and an "operation" is "a usually military *action*, mission, or maneuver including its planning and execution," *see Operation*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/operation [https://perma.cc/T33V-RXRL] (last visited July 27, 2025) (emphasis supplied). In other words, a campaign is made up of a series of separate actions, and the fact these actions are tied together by a broader goal does not serve to conflate them into the same action. Such is the case with the sixteen separate attacks at issue in this case. While each attack might have been part of a broader campaign by the terrorist syndicate to attack American and coalition forces in an effort to force their withdrawal from Afghanistan, each attack was a separate action in support of that goal.

This interpretation is further supported by background legal principles governing sovereign immunity, which establish that explicit "waivers of sovereign immunity are narrowly construed 'in favor of the sovereign' and are not enlarged 'beyond what the [statutory] language requires.'" *Borochov*, 94 F.4th at 1062 (alteration in original) (quoting *World Wide Mins., Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002)). The construction of the terrorism exception urged by plaintiffs is anything but narrow. To the contrary, adopting their argument would mean that *every attack* committed by the Taliban against U.S. armed forces personnel for the thirteen-year period between 2006 and 2019 was part of the same action and thus that the terrorism

35

exception broadly waived Iranian sovereign immunity for *all* such attacks. *See* Pls.' Mem. at 11 ("[T]he Taliban-led terrorist Syndicate conducted a continuous, protracted macro-attack on U.S. armed forces personnel in Afghanistan from 2006-2019 . . . ."). The plain language of the terrorism exception does not require this result but instead suggests the opposite. The rules governing statutory interpretation of waivers of sovereign immunity also counsel narrow construction.

For these reasons, each of the sixteen terrorist attacks at issue in this case are considered separate acts. For each attack to constitute an act of extrajudicial killing sufficient to create subject-matter jurisdiction under the FSIA's terrorism exception, each terrorist attack must have killed someone. Subject-matter jurisdiction does not exist, therefore, as to the claims in this case based on the eight terrorist attacks in which no one was killed, requiring dismissal for lack of subject-matter jurisdiction of the claims of the thirty-one plaintiffs in this case falling into this category. *See supra* n.7 (listing those plaintiffs whose claims are dismissed on this basis).

### 2.    Causation

The remaining thirty plaintiffs must additionally demonstrate that each "personal injury or death" involved in the eight remaining terrorist attacks "was caused by" Iran's provision of "material support or resources" to the Taliban or other components of the terrorist syndicate. 28 U.S.C. § 1605A(a)(1). To satisfy this causation requirement "[t]he FSIA does not require plaintiffs to show that 'a state's material support [was] directly for the specific act' that caused their injuries." *Cabrera I*, 2022 WL 2817730, at *39 (alteration in original). Imposing such a strict causation requirement "'would likely render the material support provision ineffectual' because material support 'is fungible' and 'terrorist organizations can hardly be counted on to keep careful bookkeeping records.'" *Id.* (quoting *Owens*, 864 F.3d at 799). Thus, the FSIA's causation standard requires a plaintiff to show that (1) "the defendant's actions [were] a 'substantial factor'

36

in the sequence of events that led to the plaintiff's injury," and (2) that the plaintiff's injury was "'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). These requirements are met "where a state sponsor of terrorism provides material support that enhances a terrorist group's ability to attack, even where that support is not directly traceable to a specific attack." *Cabrera I*, 2022 WL 2817730, at *39-40 (collecting cases in support of this proposition).

The *Cabrera* court applied this theory to find Iran liable for the syndicate attacks at issue in that case—three of which are also alleged in the instant case. *Id.* at *40-41.[13] Reasoning that "Iran provided the Syndicate with weapons, explosives, training, financial support, safe haven, and assistance with the Syndicate's drug-trafficking operations," and that this support "was fungible between members of the Syndicate . . . and [] eliminated the need for those members to compete with each other for resources," the *Cabrera* court found Iran's support to be a substantial factor that caused the attacks at issue in that case. *Id.*

As Chief Judge Boasberg persuasively points out in *Sibley*, however, this reasoning appears to suppose "that any type of material support to a terrorist organization proximately causes any later attack, full stop, regardless of the organizational structure of the group or the specific capability on display in the attack." *Sibley*, 2025 WL 1928036, at *11. In the context of Iranian support for the Taliban and associated groups in the syndicate, this argument suggests that "Iran's material support enhanced the operational capacity of the Taliban writ large in such a way that such support—regardless of the form it took—can be considered a substantial factor for any type of attack by any component of the Taliban in any area of Afghanistan at any time" during the

---

[13]    Specifically, the *Cabrera* court found that Iran provided material support for three of the attacks at issue in the instant case: (1) the August 18, 2009, attack that injured plaintiff Kevin Deas; (2) the October 29, 2011, attack that injured plaintiff Michael Pabon; and (3) the May 18, 2012, attack that injured plaintiff Scott Smith. *See* Pls. Resp. to MO at 2; *Cabrera II*, 2024 WL 3225942, at *6; *Cabrera I*, 2022 WL 2817730, at *21.

37

relevant period of a case. *Id.* The evidence in *Sibley* established that the Taliban operated as "a large, dispersed, and often decentralized insurgent group," *id.*, showing the flaw in the reasoning that "material support received by one component of the Taliban would necessarily have enhanced the operational capacity of another—or all components," *id.* at *12. Due to this dispersed and decentralized structure, support provided to one faction or component of the organization may not automatically enhance the capabilities of a separate faction or component. *See, e.g.*, *id.* at *13 ("[E]ven with financial assistance, there are instances when the organizational structure of the group might preclude proximate causation. For example, . . . [it] is not a foregone conclusion that if funds were provided directly to a Taliban commander in, say, Herat, such funds would necessarily increase the capacity of a faction operating on the other side of the country in Nangarhar."); *id.* (describing such a logical assumption, when not based on evidence, as an "untenable leap"). On this basis, Chief Judge Boasberg concluded that the *Sibley* plaintiffs had failed to prove that Iran had proximately caused the attacks at issue in that case. *Id.* at *15.

The same flaw identified in *Sibley* applies here to some of the evidence presented by plaintiffs to show that Iran provided material support to the Taliban. For instance, Dr. Clarke opined that the Taliban operated with a "decentralized" structure, Clarke Report at 1, 8, which "empowered" local commanders "to recruit and find resources locally," *id.* at 8 (quoting Mashal, *supra*). Moreover, as in *Sibley*, plaintiffs here have not provided evidence that each component of the Taliban received weaponry, training, and safe haven from Iran. *See* 2025 WL 1928036, at *12. In fact, some of the sources relied on suggest the opposite. *See, e.g.*, Clarke Report at 43-44 (quoting the U.S. Department of the Treasury as stating that, "in Afghanistan, the IRGC-QF provides *select members* of the Taliban with weapons, funding, logistics, and training" (emphasis supplied)). *Compare id.* at 14 n.53 (citing U.S. State Dep't, *Country Reports on Terrorism 2009*,

at 192 (2010), as "describing Iranian provision of weapons" to the Taliban), *with Sibley*, 2025 WL 1928036, at *12 (noting that page 192 of the cited report "identif[ies] only one province—Kandahar—where Iran" shipped a large number of weapons).  While the evidence presented by plaintiffs unquestionably establishes that Iran provided weapons, training, and safe haven to at least some component(s) of the Taliban, *see* Clarke Report at 42–46, plaintiffs have not explained, and this evidence does not establish, how, notwithstanding the decentralized structure of the Taliban's organization, this Iranian material support filtered throughout the Taliban in a manner that would support a finding that the operational capacity of the Taliban as a whole, and thus the terrorist syndicate that the Taliban led, was increased.

In contrast to *Sibley*, plaintiffs here have provided sufficient evidence of increased operational capacity as to the *financial* support provided by Iran.  Dr. Clarke opines that the Taliban's central treasurer received significant Iranian funds and distributed them to fighters throughout the organization.  *See* Clarke Report at 47 ("[T]he Taliban treasurer distributed $77,000 of Iranian funds to Syndicate fighters between April and September 2010.").  The fact that the money was received by Taliban leadership and then distributed to fighters undoubtedly increased the organizational capacity of the Taliban as a whole to carry out terrorist attacks.  That this was the result sought by Iran is also clear, given that Iran placed bounties on American soldiers and provided funding to the Taliban for every American soldier killed and every American military vehicle destroyed.  *Id.*  On this basis, the evidence plaintiffs have presented of Iran's provision of financial support to the Taliban satisfies the FSIA's state-sponsored terrorism exception, meaning that subject-matter jurisdiction exists for the thirty plaintiffs who have met the other requirements of the FSIA.

**B.  Personal Jurisdiction under the FSIA**

39

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of [the FSIA]." 28 U.S.C. § 1330(b).  Section 1608 first prescribes two methods by which service shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)-(2), but these methods were "not available" to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61 (D.D.C. 2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), as "defendant[] ha[s] neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

Plaintiffs attempted service under Section 1608(a)(3) by sending a copy of the summons, complaint, notice of suit, and a copy of the FSIA, along with a translation of each into Iran's official language, by certified or registered mail to Iran's Ministry of Foreign Affairs.  *See* Aff. Requesting Foreign Mailing, ECF No. 6.  Plaintiffs then transmitted the same documents under the cover of diplomatic notes, following the procedure for service provided by 28 U.S.C. § 1608(a)(4), and Iran was thus served on March 6, 2023.  *See* Return of Service/Aff. of Summons & Complaint Executed.  On March 28, 2023, the U.S. Department of State certified that the requirements for diplomatic service under 28 U.S.C. § 1608(a)(4) had been satisfied on March 6, 2023.  *See id.* at 1.

Accordingly, this Court has personal jurisdiction over Iran because plaintiffs effectively executed service under 28 U.S.C. § 1608(a)(4).

## C. Iran's Liability

Plaintiffs seek relief under Section 1605A(c) of the FSIA, which creates a private right of action for "personal injury or death," and provides that, "[i]n any such action, damages may include

40

economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c); *see also* Compl. ¶¶ 245-52 (Count I). Yet, Section 1605A(c) does not set out guidance on the substantive bases for liability that determine plaintiffs' entitlement to damages. Consequently, courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353; *see also Est. of Heiser v. Islamic Republic of Iran* ("*Heiser II*"), 659 F. Supp. 2d 20, 24 (D.D.C. 2009) (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014) (same).

Each servicemember plaintiff seeks damages for their pain and suffering. Pls.' Mem. at 40-51. Plaintiffs Baker, Deas, Pabon, Sandlin, Smith, and Winston also seek economic damages to compensate them for losses resulting from their reduced ability to work, *id.* at 40-42, 46, 48-52, while family member plaintiffs seek solatium damages, *id.* at 63-64. All plaintiffs additionally seek punitive damages. *Id.* at 91-92. Each of these different damages sought are discussed.

## D. Compensatory Damages

### 1. Pain and Suffering

When compensating victims of terrorist attacks, a court's "primary consideration" is uniformity. *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015). "[J]udges in this district have developed a general framework for assessing pain and suffering damages for direct victims of terrorist attacks," *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 268 (D.D.C. 2020), called the "*Peterson II* framework," *Cabrera I*, 2022 WL 2817730, at *43 (citing *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007). The *Peterson II* framework is in turn based on the framework laid out in *Heiser I*. *Peterson*, 515 F. Supp. at 51-53 (citing *Heiser*

41

*I*, 466 F. Supp. 2d at 271-356).  "[T]he baseline award for surviving direct terrorist attack victims is $5 million," which accounts for both "physical injuries on the theory of battery and . . . psychological injuries under the theory of intentional infliction of emotional distress."  *Cabrera I*, 2022 WL 2817730, at *43.  The $5,000,000 baseline compensates for "such physical injuries as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as 'lasting and severe psychological pain.'"  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010) (quoting *Peterson II*, 515 F. Supp. 2d at 54).  Conceived of differently, "the bar on multiple recoveries allows [plaintiffs] to recover only under one theory [of either physical injury or intentional infliction of emotional distress], for the single underlying harm," and "[w]ithin this single-recovery framework, the 'baseline assumption' . . . is that 'persons suffering injuries in terrorist attacks are entitled to $5 million in damages."  *Mustard v. Islamic Republic of Iran*, 2023 U.S. Dist. LEXIS 19748, at *30-31 (2023) (quoting *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016)).

The baseline may be increased to $7,500,000 to $12,000,000 in "more severe instances of physical and psychological pain," such as when victims suffered "more numerous and severe injuries, were rendered quadriplegic, partially lost vision or hearing, or were mistaken for dead."  *Valore*, 700 F. Supp. 2d at 84.  On the other hand, the baseline may be decreased when "victims suffered only minor shrapnel injuries or minor injury from small-arms fire."  *Id.*  This Court has, at times, used VA Disability Ratings as an "objective metric" to compare "the relative degree of injury suffered by each service member plaintiff."  *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888, at *74 (D.D.C. June 27, 2019).  "[P]laintiffs rated by the VA up to 30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40-60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and service-member

42

plaintiffs rated 70-100% disabled by the VA will receive a further upward departure, for a total of $7,000,000." *Mustard*, 2023 U.S. Dist. LEXIS 19748, at *32. That framework provides a useful guideline, though "this Court is also mindful of the need to assess each plaintiff's injuries individually." *Cabrera I*, 2022 WL 2817730, at *43. Taken together, the persuasive guidance from *Peterson II* and *Schooley* indicates that deviations up to $7,000,000 may be appropriate, as the evidence dictates, based, for example, on VA Disability Ratings or other evidence showing grievous injury.

### (a) Namig Baker's Pain and Suffering Damages

Private Baker suffered multiple physical and emotional injuries, including post-traumatic stress disorder ("PTSD"); traumatic brain injury ("TBI"), which has caused memory lapses, involuntary movements, and disequilibrium and dizziness; a cartilage tear in his left shoulder; and tinnitus. Baker Decl. ¶ 15; *see also id.*, Ex. H, Department of Veterans Affairs Veterans Benefits Administration Rating Decision ("Baker VA Disability Rating"), ECF No. 29-4 at 35. The attack has taken a "catastrophic" mental toll on him, as he has suffered from "depression, anxiety, memory loss, and stress" that plague him constantly, "like a weight around [his] neck that [he] can't shake off," causing him to feel "hopeless and defeated" and live a "lonely, isolated" life. Baker Decl. ¶¶ 18-19. He was awarded a Purple Heart and Combat Action Badge, *id.* ¶ 8, and has a 90% VA Disability Rating for the injuries he suffered in the attack, *see* Baker VA Disability Rating at 36.[14]

Plaintiffs request an award of $7,000,000 for Private Baker's pain and suffering. Pls.' Mem. at 40. An upward deviation from the $5,000,000 baseline is appropriate given Private

---

[14] Private Baker's Declaration indicates a VA Disability Rating of 100%, Baker Decl. ¶ 15, but his VA Disability Rating documentation and plaintiffs' memorandum both reflect a 90% Disability Rating, Baker VA Disability Rating at 36; Pls.' Mem. at 40.

43

Baker's high Disability Rating and especially given the damaging effects of his TBI on his long-term physical, mental, and social health. While Private Baker's injuries are undoubtedly severe and life-altering, they do not reach the level of quadriplegia or complete loss of hearing and vision. *See Valore*, 700 F. Supp. 2d at 84. Due to Private Baker's continued functioning, however minimal, an increase over the baseline to $6,500,000 in pain and suffering damages is appropriate.

### (b) Kevin Deas, Sr.'s Pain and Suffering Damages

Staff Sergeant Deas was left with a shrapnel wound in his left shoulder and physical disabilities throughout his body, including his neck, shoulder, knees, back, ankles, and hips, as well as headaches, hearing loss, and tinnitus, among other injuries. Deas Decl. ¶ 6. The injuries to his knees alone have required four separate surgeries. *Id.* ¶ 7. He also suffered a TBI and has PTSD, which has caused him to startle easily, engage in self-destructive behavior, and struggle to sleep. *Id.* ¶ 8. The physical injuries and emotional scars from the attack have caused him to "los[e] [his] wife and [his] children" and feel "lost and robbed of his purpose," as he is unable to "regain a sense of normalcy" in his life. *Id.* ¶¶ 12-15. As a result of his various injuries suffered in this attack, Staff Sergeant Deas has a 100% VA Disability Rating. *Id.* ¶ 10; *see also id.*, Ex. E, Department of Veterans Affairs Veterans Benefits Administration Rating Decision ("Deas VA Disability Rating") at 22, ECF No. 29-17 at 17.

Plaintiffs request an award of $7,000,000 for Staff Sergeant Deas's pain and suffering. Pls.' Mem. at 42. Such an award aligns with the frameworks from *Peterson II* and *Schooley* and is accordingly awarded to plaintiff Kevin Deas, Sr.

### (c) Christopher Hardesty's Pain and Suffering Damages

Specialist Hardesty suffered numerous injuries as a result of the attack, including a concussion and multiple fractures, such as a sinus fracture that caused nerve damage and a leg

44

fracture that required "a plate and eight screws to put it back together," and other injuries to his bicep, neck, elbow, shoulder, and teeth.  Hardesty Decl. ¶ 8.  He spent three months in a wheelchair, *id.* ¶ 10, and, in the aftermath of the attack, has suffered from PTSD and tinnitus, *id.* ¶ 8, has trouble focusing his left eye as a result of his injuries and resulting surgeries, has scarring on multiple parts of his body, and has developed a bone disease in his right shoulder, *id.* ¶ 9.  The psychological impact of the attack has left him with "[p]ersistent anger and hypervigilance" that have "significantly strained" his relationship with his family and other personal relationships.  *Id.* ¶¶ 11-12.  He is "currently unmarried and do[es] not have any children" and feels that "the uncertainties stemming from [his] disabilities have shadowed [his] prospects of experiencing the joys of marriage and fatherhood."  *Id.* ¶ 11.  As a result of his injuries, Specialist Hardesty has 90% VA Disability Rating.  *Id.*, Ex. F, Department of Veterans Affairs Veterans Benefits Administration Rating Decision ("Hardesty VA Disability Rating") at 32, ECF No. 29-23 at 30.

Plaintiffs request $7,000,000 in pain and suffering damages for Specialist Hardesty.  Pls.' Mem. at 43.  While Specialist Hardesty's injuries are severe and life-changing, his 90% VA Disability Rating makes an award of $6,500,000 more appropriate.

### (d) John Iasiello's Pain and Suffering Damages

Specialist Iasiello suffered a number of severe long-term injuries as a result of the attack, including a spinal injury, TBI, migraines, stress fractures in his legs and impairments to his knees, nerve problems, and PTSD.  *Id.* ¶ 8.  These injuries have resulted in a VA Disability Rating of 100%.  *Id.*; *see also id.*, Ex. G, Department of Veterans Affairs Veterans Benefits Administration Rating Decision ("Iasiello VA Disability Rating") at 28, ECF No. 29-30 at 26.  To this day, Specialist Iasiello "continue[s] to experience the effects of the terrorist attack," as he struggles with anxiety, insomnia, lack of interest, trouble concentrating, nightmares and intrusive thoughts,

45

verbal aggression, survivor's guilt, and "occupational and social impairment." Iasiello Decl. ¶¶ 9-12.

Plaintiffs request $7,000,000 in damages for Specialist Iasiello's pain and suffering, Pls.' Mem. at 44, and that award is appropriate.

### (e) Joseph Sandlin's Pain and Suffering Damages

Sergeant Sandlin suffered a serious TBI that required almost a year of intensive treatment. *See* Sandlin Decl. ¶¶ 22-28. He was also diagnosed with PTSD and suffered with the symptoms, including sleep disruption, impaired memory and cognitive ability, mood swings, difficulty establishing and maintaining relationships, and difficulty managing stressful situations. *Id.* ¶¶ 28-29. He also struggled to perform "basic functions like walking, talking, or driving." *Id.* ¶ 31. He withdrew emotionally, which resulted in the end of his marriage, *id.* ¶ 32, and other family difficulties, *id.* ¶¶ 33-37. He often feels "angry, sad, and frustrated with how [his] life has turned out." *Id.* ¶ 38. As a result of his injuries from the attack, Sergeant Sandlin has a VA Disability Rating of 100%. *Id.*, Ex. F, Department of Veterans Affairs Veterans Benefits Administration Rating Decision ("Sandlin VA Disability Rating") at 50, ECF No. 29-60 at 49.

Plaintiffs request $7,000,000 in damages for Sergeant Sandlin's pain and suffering, Pls.' Mem. at 48, and that award is appropriate.

### (f) Michael Pabon's Pain and Suffering Damages

While recovering from the attack he experienced, Sergeant Pabon "experienced pain in [his] neck, left shoulder, elbow and lower back," as well as severe headaches. Pabon Decl. ¶ 9. He also had nightmares and flashbacks, suffered from insomnia, "and withdrew from most social interaction," isolating himself. *Id.* He was diagnosed with PTSD, TBI, shoulder pain, lumbar strain, and neck pain, and given a VA Disability Rating of 100%. *Id.* ¶ 10; *see also id.*, Ex. G,

46

Department of Veterans Affairs Veterans Benefits Administration Rating Decision ("Pabon VA Disability Rating") at 29, ECF No. 29-48 at 28.  In his daily life, he suffers from chronic pain, mood swings and memory loss, the inability to work, negatively impacted personal relationships, and survivor's guilt.  *See* Pabon Decl. ¶¶ 12-17.  He has been unable to work since 2014.  *Id.* ¶¶ 12, 14.

Plaintiffs request $7,000,000 in damages for Sergeant Pabon's pain and suffering, Pls.' Mem. at 46, and that award is appropriate.

### (g) Scott Smith's Pain and Suffering Damages

After his evacuation, Specialist Smith suffered from "a TBI causing [him] more and more severe headaches, which triggered an unsettling stutter; a declining short-term memory; and chronic pain in [his] knee, lower back, and heel."  Smith Decl. ¶ 16.  After returning to the United States, he "participated in numerous physical therapy sessions and classes over the next six years," all to "relearn[] basic skills such as breathing, cooking, and tying [his] shoes."  *Id.* ¶ 19.  He suffered an impacted skull from his C1 and C2 vertebrae, two fractured vertebrae, herniated disks, compromised vision, and "ruptured eardrums necessitating the use of hearing aids."  *Id.* ¶ 20.  He described the TBI he suffered as "the most sinister among all [his] wounds," since "its ramifications seep into every facet of [his] life."  *Id.* ¶ 21.  As a result of these injuries, Specialist Smith has a VA Disability Rating of 100%.  *Id.* ¶ 25; *see also id.*, Ex. D, Department of Veterans Affairs VA Regional Office 350 Rating Decision ("Smith VA Disability Rating") at 25, ECF No. 29-64 at 21.  In addition to his physical injuries, the terrorist attack has left Specialist Smith "mentally tormented" and has had a devastating impact on him financially and emotionally, as he is unable to work, "protect[] and provide[] for [his] family," maintain familial relationships and friendships, and manage his emotions.  *See id.* ¶¶ 22-45.  Due to his "mental and emotional injuries

. . . and the way they incapacitated [him]," his marriage ended in divorce, *id.* ¶ 38, and his other family relationships have become strained, *id.* ¶¶ 36, 42-43.

Plaintiffs request $7,000,000 in damages for Specialist Smith's pain and suffering, Pls.' Mem. at 49, and that award is appropriate.

### (h) Ryan Winston's Pain and Suffering Damages

Staff Sergeant Winston was diagnosed with three gunshot wounds, shrapnel injuries, a concussion and TBI, and PTSD. Winston Decl. ¶ 14. Based on his injuries, he received a VA Disability Rating of 90%. *Id.* ¶ 28; *see also id.*, Ex. F, Department of Veterans Affairs Veterans Benefits Administration Rating Decision ("Winston VA Disability Rating") at 48, ECF No. 29-70 at 26. He experienced "recurrent, extremely painful, and debilitating migraine headaches," *id.* ¶ 16, and "constant, intense pain" throughout the rest of his body, *id.* ¶ 19, as well as memory issues, anxiety, and trouble concentrating, *id.* ¶ 17. To the present day, he suffers from anxiety, depression, rage, and trust issues that have left him unable to work and have caused him to cease contact with friends, withdraw from his family, suffer from insomnia, experience nightmares and "intrusive delusions," and feel inadequate. *See id.* ¶¶ 21-38.

Plaintiffs request $7,000,000 in damages for Staff Sergeant Winston's pain and suffering. Pls.' Mem. at 51. Staff Sergeant Winston's injuries have irrevocably changed his life and the lives of his family members. Given the importance, however, of awarding similar damages for similar injuries, $6,500,000 is appropriate, given that Staff Sergeant Winston apparently retains a quantum of functional capacity as reflected by his VA Disability Rating.

### 2.    Economic Damages

"As a general rule, lost earnings—past and future—are compensable economic damages." *Moradi*, 77 F. Supp. 3d at 71. Since "lost earnings are not hard to quantify," plaintiffs seeking

48

economic damages must provide "competent evidence" beyond a simple declaration of losses.  *Id.*

For instance, "[t]he report of a forensic economist may provide a reasonable basis for determining

the amount of economic damages in an FSIA case," especially when the economist's report "bases

its damages calculations on reasonable and well-founded assumptions."  *Reed v. Islamic Republic*

*of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *see also Belkin v. Islamic Republic of Iran*, 667

F. Supp. 2d 8, 24 (D.D.C. 2009).

        In the D.C. Circuit, economic damages must generally be discounted for taxes.  *Hooks v.*

*Wash. Sheraton Corp.*, 578 F.2d 313, 317 (D.C. Cir. 1977).  In other words, because plaintiffs

ordinarily would have paid income taxes on any wages they would have earned had they not been

injured, and since compensatory damages for physical injuries are generally not taxable, 26 U.S.C.

§ 104(a)(2), damages replacing those wages must be reduced by the amount that the wages would

have been taxed.  *See Pennington v. Islamic Republic of Iran*, No. 19-cv-796 (JEB), 2022 WL

18814284, at *1 (D.D.C. May 3, 2022).

        Plaintiffs provided detailed estimates of economic damages prepared by Dr. Michael

Willoughby, who has a doctorate in economics and has performed financial analyses, academically

and professionally, for nearly 40 years.  See Pls. Mem., Ex. 86, Declaration of Dr. Michael

Willoughby, Ph.D. ("Willoughby Decl.") ¶ 2, ECF No. 29-86.  He also served in the Navy for 22

years, retiring as a Captain in 1997 having served six of those years on active duty.  *Id.* ¶ 2.  Dr.

Willoughby considered the rank plaintiffs might have reached in the military, the amount of their

military pensions, and the likelihood of their post-service civilian employment.  *See, e.g.*,

Willoughby Report re: Namig Baker, ECF No. 29-9.  He also relied on expert reports from Maria

Vargas, a vocational counselor who evaluated each plaintiff's ability to earn money through future

employment.  *See* Pls. Mem., Ex. 6, Expert Report of Michael Willoughby re: Namig Baker at 3,

ECF No. 29-9; *id.*, Ex. 18, Expert Report of Michael Willoughby re: Kevin Deas at 3, No. 29-21; *id.*, Ex. 48, Expert Report of Michael Willoughby re: Michael Pabon at 3, ECF No. 29-51; *id.*, Ex. 59, Expert Report of Michael Willoughby re: Joseph Sandlin at 3, ECF No. 29-62; *id.*, Ex. 64, Expert Report of Michael Willoughby re: Scott Smith at 3, ECF No. 29-67; *id.*, Ex. 75, Expert Report of Michael Willoughby re: Ryan Winston at 3, ECF No. 29-78.  In response to the Court's order, *see* Minute Order, August 26, 2025, plaintiffs submitted supplementary calculations from Dr. Willoughby accounting for the likely taxes plaintiffs would pay on their earnings.  Addendum to Expert Report of Michael G. Willoughby ("Willoughby Addendum"), ECF No. 36-1.

Dr. Willoughby's reports are thorough, detailed, and appear to make "reasonable and well-founded assumptions."  *Reed*, 845 F. Supp. 2d at 214.  The Court is satisfied that Dr. Willoughby and Ms. Vargas are qualified to offer the opinions provided, see FED. R. EVID. 702, and that their reports comply with all relevant requirements, see *id.*; FED. R. EVID. 703.  Accordingly, the economic damages summarized in Exhibits 4, 5, 9, 11, 12, and 13 of the Willoughby Addendum, for plaintiffs Namig Baker in the amount of $2,741,228; Kevin Deas in the amount of $2,268,072; Michael Pabon in the amount of $2,310,223; Joseph Sandlin in the amount of $2,634,388; Scott Smith in the amount of $1,647,488; and Ryan Winston in the amount of $2,374,660 are adopted. *See* Willoughby Addendum, Exs. 4, 5, 9, 11, 12, 13.[15]

### 3. Solatium Damages

Solatium damages "'began as a remedy for the loss of a spouse or a parent . . . [and] ha[ve] since expanded to include the loss of a child' and 'in some circumstances, [] can include the loss of a sibling.'" *K.E.F.V. v. Islamic Republic of Iran*, 135 F.4th 988, 991-92 (D.C. Cir. 2025) (quoting *Fraenkel*, 892 F.3d at 356).  Calculating solatium damages rests on consideration of two factors:

---

[15]    No economic damages were requested by plaintiffs Specialist Iasiello and Specialist Hardesty, and no expert reports assessing these plaintiffs' likely economic losses were submitted.

"The first is the 'injury to the feelings' of a family member caused by the circumstances of the" servicemember's injuries, and "[t]he second is the loss of the [servicemember's] comfort and society.'" *Id.* at 992 (quoting *Fraenkel*, 892 F.3d at 356); *id.* at 995 ("[S]olatium also covers the loss of the decedent's comfort and society." (internal quotation marks omitted)); *see also Mustard*, 2023 U.S. Dist. LEXIS 19748, at *34 (In FSIA cases, "solatium damages have . . . been awarded to compensate for the emotional distress of the family members of surviving victims.").

To ensure fairness and consistency in awards for solatium damages for victims of state-sponsored terrorist acts across cases in this District, a general framework may be used: "baseline solatium awards are $4,000,000 to spouses of surviving victims and $2,500,000 to parents of surviving victims; [c]hildren of [] surviving victim[s] receive $1.5 million on average, and siblings of surviving victims receive $1,250,000." *Id.* (citations and internal quotation marks omitted) (first alteration in original). Courts may "presume that spouses and those in direct lineal relationships with victims of terrorism suffer compensable mental anguish." *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014). "As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain claims for solatium." *Id.* This framework provides a structured and equitable way of awarding damages for the difficult-to-quantify losses of plaintiff family members.

### (a) Parents

Four plaintiffs are parents of the remaining eight servicemember plaintiffs, and each is entitled to $2,500,000 in solatium damages.[16] The Court finds nothing in the record to disrupt the presumption that these parent plaintiffs suffered terribly when their children were injured in these attacks. Private Baker's mother and father describe the trauma of hearing that their son had been

---

[16]    Adoptive parents are treated identically to biological parents. *See Valore*, 700 F. Supp. 2d at 79.

injured and of realizing that he was permanently changed by the attack. Decl. of Pl. Irina Gorodnitsky ("Gorodnitsky Decl.") ¶ 8, 16, ECF No. 29-5; Decl. of Pl. Glenn Eli Baker ("G. Baker Decl.") ¶ 6, 8-9, ECF No. 29-6. Ms. Gorodnitsky, Private Baker's mother, characterized a "profound sense of grief and hopelessness," Gorodnitsky Decl. ¶ 16, and Mr. Baker, Private Baker's father, said that his son's ongoing struggles are "breaking [his] heart," G. Baker Decl. ¶ 8. Specialist Hardesty's parents similarly describe a relationship with their son that was once warm and close but was "profoundly changed" by Specialist Hardesty's injuries. Decl. of Pl. James Hardesty ("J. Hardesty Decl.") ¶ 10, ECF No. 29-24; *see also* Decl. of Pl. Kelli Hardesty ("K. Hardesty Decl.") ¶ 8, ECF No. 29-25. Since the "sheer terror" of finding out about their son's injuries, K. Hardesty Decl. ¶ 3, Mr. and Mrs. Hardesty have suffered significantly. These accounts corroborate the presumption that these plaintiff parents were profoundly affected by their children's injuries.

### (b) Spouses

The three plaintiff spouses of the eight remaining servicemember plaintiffs are entitled to solatium damages.[17] The spouses' declarations bolster the presumption that each of these plaintiffs suffered grievous emotional harm due to their spouse's injuries. All three spouses described the shock and terror of hearing that their husbands had been injured in attacks while serving abroad. Decl. of Pl. Sophronia Winston ("Sophronia Winston Decl.") ¶ 8, ECF No. 29-75; Decl. of Pl. Annmarie Deas ("A. Deas Decl.") ¶ 11, ECF No. 29-18; Decl. of Pl. Eva Carrera ("E. Carrera Decl.") ¶ 5, ECF No. 29-50. Ms. Deas and Ms. Winston bore the added burden of caring for and counseling their or their husband's children through the fear of losing their fathers and the reality

---

[17] The three spouse plaintiffs are: Annmarie Deas, former wife of plaintiff Kevin Deas, Sr. at the time of the attack, Pls.' Mem at 67; Eva Carrera, wife of plaintiff Michael Pabon, *id.* at 70-71; and Sophronia Winston, wife of plaintiff Ryan Winston, *id.* at 73-74.

of having their fathers changed forever by terrorist attacks.  A. Deas Decl. ¶ 18-19; Sophronia Winston Decl. ¶ 14-15.

Annmarie and Kevin Deas divorced in June 2010, less than a year after the attack, in part because of Staff Sergeant Deas's injuries and the "wedge" they drove into the relationship.  A. Deas Decl. ¶¶ 16-17.  In Ms. Deas's view, the attack "destroyed [their] family unit."  *Id.* ¶ 19.  Yet, since they have been divorced for 15 years, and she no longer must live constantly with Staff Sergeant Deas, the amount of damages is reduced to $1,000,000.  *See, e.g.*, *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955, at *34 (D.D.C. Aug. 15, 2023) ("Where attenuation in a relationship has occurred, such as spouses divorcing . . . a downward deviation is appropriate."); *Aceto v. Islamic Republic of Iran*, No. 19-cv-262 (BAH), 2020 WL 619925, at *21 (D.D.C. Feb. 7, 2020) (same).

The other two spouses in the case, Eva Carrera and Sophronia Winston, remained married to the servicemember plaintiffs, and each is entitled to $4,000,000 in damages. Both explained that their husbands' injuries fundamentally altered the nature of their marriages, turning the plaintiff spouses from equal partners to caregivers, and that status has continued.  E. Carrera Decl. ¶ 11, 14; Sophronia Winston Decl. ¶ 10, 17.  The standard damages are therefore appropriate.

### *(c)  Children*

The eight child plaintiffs of the eight remaining servicemember plaintiffs are entitled to $1,500,000 each in solatium damages.[18]  Their declarations depict the pain of losing father figures, Decl. of Pl. Savannah Sandlin ¶ 7, ECF No. 29-61; Decl. of Pl. W.S. ¶ 3, 6, ECF No. 29-66, Decl.

---

[18]    The eight child plaintiffs are: K.D., son of plaintiff Kevin Deas, Sr., Pls.' Mem. at 67; A.D., daughter of plaintiff Kevin Deas, Sr., *id.* at 68; Savannah Sandlin, daughter of plaintiff Joseph Sandlin, *id.* at 72; W.S., son of plaintiff Scott Smith, *id.* at 72; R.S., daughter of plaintiff Scott Smith, *id.* at 73; Amari Winston, daughter of plaintiff Ryan Winston, *id.* at 74; Jazmine Winston, daughter of plaintiff Ryan Winston, *id.* at 75; and Arshianna Winston, daughter of plaintiff Ryan Winston, *id.*

of Pl. R.S. ¶ 4-6, ECF No. 29-65; Decl. of Pl. Amari Winston ¶ 10, ECF No. 29-71; Decl. of Pl.

Jazmine Winston ¶ 6-7, ECF No. 29-74; Decl. of Pl. Arshianna Winston ¶ 10-11, ECF No. 29-72,

and, for the children who were very young when their fathers were injured, of having no memories

of what their fathers were like prior to the attacks, Decl. of Pl. A.D. ¶ 2-3, ECF No. 29-19; Decl.

of Pl. K.D. ¶ 2-3, 6, ECF No. 29-20.  These lifechanging harms merit the standard damages

awarded to children in cases such as these.

### (d)  Siblings

The six sibling plaintiffs of the eight remaining servicemember plaintiffs are entitled to

$1,250,000 each in solatium damages.[19]  Not only did these sibling plaintiffs feel terrified at what

had happened to their brothers, they also saw the after-effects of the attacks fracture what had once

been close familial relationships.  Decl. of Pl. Samuel Baker ¶ 5, 11, 13, ECF No. 29-8; Decl. of

Pl. Natiq Baker ¶ 5, 11-12, ECF No. 29-7; Decl. of Pl. Nicholas James Hardesty ¶ 5, 7, ECF No.

29-26; Decl. of Pl. Sherman Winston ¶ 6-7, 9, ECF No. 29-76; Decl. of Pl. Corkney Winston ¶ 7,

9-10, ECF No. 29-73; Decl. of Pl. Tryman Merrel Winston ¶ 6, 8-9, ECF No. 29-77.  These harms

merit the standard damages awarded to siblings in these types of cases.

### (e)  Other Family Member

In general, only immediate family members—parents, spouses, children, and siblings—

may recover solatium damages.  *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 335-36 (D.C.

Cir. 2003).  To extend liability further would run afoul of the FSIA's command to hold foreign

sovereigns liable "to the same extent as a private individual under like circumstances," because

---

[19]    The six sibling plaintiffs are: Samuel Baker, brother of plaintiff Namig Baker, Pls.' Mem. at 65; Natiq Baker, brother of plaintiff Namig Baker, *id.* at 66; Nicholas Hardesty, brother of plaintiff Christopher Hardesty, *id.* at 70; Sherman Winston, brother of plaintiff Ryan Winston, *id.* at 76; Corkney Winston, sister of plaintiff Ryan Winston, *id.* at 76; and Tryman Merrel Winston, brother of plaintiff Ryan Winston, *id.* at 77.

intentional infliction of emotional distress claims generally cover only immediate family members. *Id.* at 335 (quoting 28 U.S.C. § 1606). Nonetheless, "'members of the victim's household' who are 'viewed as the functional equivalents of immediate family members'" may recover solatium damages. *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (quoting *Bettis*, 315 F.3d at 337). The D.C. Circuit has cautioned that expanding this exception to "embrace [family members] who do not live in the immediate household or have any legal obligation to the victim would stretch the term too far." *Bettis*, 315 F.3d at 337.

Maricruz Carrera is the mother of plaintiff Eva Carrera and the mother-in-law of servicemember plaintiff Michael Pabon. Decl. of Pl. Maricruz Carrera ("M. Carrera Decl.") ¶ 1, ECF No. 29-49. When Ms. Carrera's daughter Eva began dating Sergeant Pabon, Ms. Carrera learned that he was estranged from his family, and she therefore endeavored to "love[] him as a mother loves her own son" and to "celebrate[] his accomplishments, offer[] him advice, and provide[] the emotional support he had been missing for so long." M. Carrera Decl. ¶ 3. She learned about the attack when her daughter received a phone call while they were visiting Ms. Carrera's sister in Los Angeles, California. *Id.* ¶ 4. Upon learning that her son-in-law had been injured, Ms. Carrera felt "shocked and saddened." *Id*. When Sergeant Pabon returned home a few months later, Ms. Carrera felt he was "very much a different man." *Id*. ¶ 5. She subsequently invited Sergeant Pabon and her daughter, Eva, who were experiencing "severe economic difficulties," to live with her. *Id*. ¶ 6. Ms. Carrera continues to help Sergeant Pabon and his wife financially and with childcare. *Id*. ¶ 8. Ms. Carrera takes care of Sergeant Pabon "like a son," despite finding it "painful to see him hurting in this way." *Id*. ¶¶ 8-10.

Although Ms. Carrera undoubtedly suffered as a result of her son-in-law's injuries in the terrorist attack, she is not an immediate family member eligible to recover solatium damages. Prior

to the attack, she did "not live in the immediate household or have any legal obligation to the victim." *Bettis*, 315 F.3d at 337.  Sergeant Pabon and Ms. Carrera's relationship is undoubtedly a close in-law one, but still differs from those cases in which courts have stretched the definition of "immediate family member" beyond its literal definition.  Such cases have typically been between the servicemember victim and their step-parent or step-sibling who lived with the servicemember victim since the latter's childhood, *see, e.g.*, *Fritz*, 324 F. Supp. 3d at 63, not with family members by marriage who have admirably, but voluntarily, taken on a caregiver role of the adult victim after the attack.  Accordingly, Ms. Carrera is not entitled to solatium damages.

### E. Punitive Damages

Plaintiffs seek punitive damages in an amount equivalent to whatever compensatory damages is awarded.  Pls.' Mem. at 92.  Four factors are considered when setting the level of punitive damages: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Selig*, 573 F. Supp. 3d at 75 (quoting *Estate of Steinberg v. Islamic Republic of Iran*, No. 17-cv-1910 (RCL), 2019 WL 6117722, at *9 (D.D.C. Nov. 18, 2019)).  Iran's acts were heinous and intended to cause plaintiffs grievous harm, as evinced by the bounty placed by Iran on the killing of American soldiers.  Clarke Report at 47 (explaining that Iran offered to pay the Taliban $1,000 for every American soldier killed).  Although plaintiffs have provided no evidence of Iran's wealth, "Iran 'is a sovereign nation that can be presumed to possess significant wealth.'" *Cabrera I*, 2022 WL 2817730, at *56 (quoting *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 251 (D.D.C. June 10, 2020).

"There is a need for deterrence because, time and again, courts in this district have been confronted with families shattered by Iran-backed terrorists." *Selig*, 573 F. Supp. 3d at 75.  At the

same time, plaintiffs in state-sponsored terrorism cases against Iran are rarely successful in collecting their judgment from Iran itself.  Brief of the United States as *Amicus Curiae* at 3, *Bank Markazi v. Peterson*, 578 U.S. 212 (2016).  Due to this difficulty in enforcing FSIA default judgments against Iran and other state sponsors of terrorism, Congress created the U.S. Victims of State Sponsored Terrorism Fund ("the Fund").  34 U.S.C. § 20144(b).  The Fund is maintained through collections of civil and criminal penalties and forfeited property extracted from defendants found responsible for certain federal offenses involving the violation of economic sanctions against state sponsors of terrorism.  34 U.S.C. § 20144(e)(2).  Only compensatory damages, not punitive damages, are eligible for withdrawal from the fund, however.  *Id.* § 20144(c)(2)(A).

Though difficult, plaintiffs may be able to recover against Iran itself, and thus any punitive damages awarded would have a direct deterrent effect.  For instance, plaintiffs in another state-sponsored terrorism FSIA case were permitted to execute a $2 billion judgment against Iranian assets held by a New York financial institution after Congress passed a law specifically allowing such execution.  *See Bank Markazi*, 578 U.S. at 215.  Nonetheless, the deterrent effect of punitive damages is dampened given the difficulties in enforcement.

Taking into consideration those four factors, courts in this District have used several different methods to calculate punitive damages for the victims of state-sponsored terrorism.  *Selig*, 573 F. Supp. 3d at 75.  First, in cases of conduct even "'more outrageous'" with "'more tragic' outcomes than the typical terrorist attack," the court has awarded punitive damages equivalent to a multiple of the state sponsor's annual expenditures on terrorism.  *Id.* (quoting *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 54 (D.D.C. 2016)).  Such awards are typically in the billions of dollars.  *Id.*

Second, in some cases, a flat punitive damages amount is assigned to each plaintiff (or plaintiff's estate), unpegged from any real-world value. *Id.* at 76 (citing *Estate of Steinberg*, 2019 WL 6117722, at *10). If followed uniformly, such a method may have the benefit of predictability, which has the deterrent effect of letting "[a] 'bad man' look ahead with some ability to know what the stakes are in choosing one course of action or another.'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502 (2008). Conversely, though, such flat punitive damages do not account for differences in the heinousness of the attacks or the suffering wrought upon the plaintiffs.

Third, in some cases, the punitive damages amount is "calculated [based on] the total compensatory damages awarded for a victim," which is "then multiplied . . . 'by a factor between one and five.'" *Selig*, 573 F. Supp. 3d at 76 (quoting *Fritz*, 324 F. Supp. 3d at 65). A triple multiplier is used in that method as a baseline, upgrading or downgrading depending on how reprehensible the attack. *Id.*

Finally, another method is simply to award punitive damages identical to compensatory damages. *Id.* This approach is motivated, in part, by the observation that high damages awards appear to have done little to deter Iran from funding further terrorist attacks, perhaps because of the difficulties with enforcement discussed above. *Id.* (citing *Christie v. Islamic Republic of Iran*, No. 19-cv-1289 (BAH), 2020 WL 3606273, at *28 (D.D.C. July 2, 2020)). This is the method plaintiffs request here. Pls.' Mem. at 92. This approach is most consistent with the goals of punitive damages, especially given the low likelihood of punitive damages successfully accomplishing a deterrent effect in this case. Each plaintiff is accordingly awarded punitive damages equivalent to their respective compensatory damages.

## F.  Prejudgment Interest

Plaintiffs next seek prejudgment interest, Compl. ¶ 253(d); *see also* Pls.' Mem. at 92-94, as to their "pain and suffering and solatium awards," Pls.' Mem. at 93.  As has repeatedly been recognized, whether to award prejudgment interest "is a question that rests within this Court's discretion, subject to equitable considerations." *Oveissi III*, 879 F. Supp. 2d at 58; *see also, e.g.*, *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997); *Akins*, 332 F. Supp. 3d at 45-46; *Thole*, 2024 WL 2208208, at *17.  In FSIA cases, most Judges on this Court who have considered this issue have concluded—as this Court did in *Akins*—that "pain and suffering and solatium damages are both designed to be fully compensatory" and prejudgment interest is therefore unwarranted as to those categories of damages.  *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 60 (D.D.C. 2020) (Contreras, J.) (quoting *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012) (Lamberth, J.)); *see Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021) (Friedrich, J.) (denying prejudgment interests because the award "in *today's dollars* fully compensates the crew members and their estates for their time spent in captivity" (emphasis in original)); *Bathiard v. Islamic Republic of Iran*, Nos. 16-cv-1549, 17-cv-2006 (CRC), 2020 WL 1975672, at *8 (D.D.C. Apr. 24, 2020) (Cooper, J.) (holding that "prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation"); *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *10 (D.D.C. July 11, 2019) (Boasberg, J.) (denying prejudgment interest because "direct-injury and solatium awards [are] to be fully compensatory" already); *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 79, 94, 99 (D.D.C. 2019) (Spec. Master Report), adopted by *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75, 79 (D.D.C. 2019) (Kollar-Kotelly, J.); *Thuneibat*, 167 F. Supp. 3d at 54-55 (Howell, J.).  Thus, the overarching tide of persuasive precedent in this District weighs against awarding

prejudgment interest for pain and suffering and solatium damages. Such an award is even less warranted for punitive damages, since prejudgment interest "does not apply to punitive damages because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 43 (D.D.C. 2012)).

For these reasons, and consistent with the weight of this persuasive precedent, plaintiffs are not entitled to prejudgment interest on their pain and suffering and solatium damages.[20] As has previously been explained "[i]n adopting the *Heiser* framework, this Court determined that the values set by that scale represent the appropriate level of compensation, *regardless of the timing of the attack*." *Oveissi v. Islamic Republic of Iran* ("*Oveissi II*"), 768 F. Supp. 2d 16, 30 n.12 (D.D.C. 2011) (emphasis supplied); *see also Maupin*, 405 F. Supp. 3d at 94; *Thuneibat*, 167 F. Supp. 3d at 54. Indeed, nonpecuniary damages for pain and suffering and solatium "do not typically require prejudgment interest because they are 'designed to be fully compensatory.'" *Thuneibat*, 167 F. Supp. 3d at 54 (quoting *Wyatt*, 908 F. Supp. 2d at 232). Plaintiffs here "have not provided any reason why awards under [the *Heiser*] framework are insufficient to provide 'complete compensation,'" *Akins*, 332 F. Supp. 3d at 46 (quoting *West Virginia v. United States*, 479 U.S. 305, 310 (1987)); *see also, e.g.*, *Oveissi II*, 768 F. Supp. 2d at 30 n.12 (finding "no reason to deviate from [the Court's] standard practice" of awarding damages based on the values set by the *Heiser* framework, which "represent the appropriate level of compensation," to award

---

[20]    Plaintiffs correctly did not seek prejudgment interest on the economic and punitive damages awarded. For the servicemember plaintiffs who sought and were awarded damages for economic losses, plaintiffs' briefing makes clear the economic losses sought were adjusted to the "net present value" of those damages. *See, e.g.*, Pls.' Mem. at 41, 42, 46, 48, 49, 51. When economic losses have already been adjusted to the net present value, "a separate award of prejudgment interest would be duplicative," *Thuneibat*, 167 F. Supp. 3d at 54; *see also Bathiard*, 2020 WL 1975672, at *8. As to punitive damages, "prejudgment interest does not apply . . . because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at 43).

prejudgment interest).  Accordingly, plaintiffs are awarded monetary damages in the amounts established above without prejudgment interest.

### G. Post-Judgment Interest

Finally, plaintiffs seek the award of post-judgment interest.  Compl. ¶ 253(d); *see also* Pls.' Mem. at 94.  Post-judgment interest may be awarded against a foreign sovereign when the FSIA provides jurisdiction.  *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005); *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013); *Schooley*, 2019 WL 2717888, at *79.  Under federal law, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," and "[s]uch interest shall be calculated from the date of the entry of judgment."  28 U.S.C. § 1961(a).  When post-judgment interest is sought, application of Section 1961(a) is mandatory, not discretionary.  *See, e.g.*, *Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Lanny J. Davis & Assocs. LLC*, 962 F. Supp. 2d at 165; *Selig*, 573 F. Supp. 3d at 78. Plaintiffs will therefore be awarded post-judgment interest at the statutory rate set out in 28 U.S.C. § 1961.

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Judicial Notice, ECF No. 28, is granted, and plaintiffs' Motion for Default Judgment, ECF Nos. 27, 29 (sealed), is granted in part and denied in part.  Specifically, default judgment is denied as to the claims of the following thirty-one plaintiffs, whose claims are dismissed, pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction: Johnny Butler, Jr.; Sherita Sanders; Arletha Pettie; Claudia Pettie; Mecko Johnson; Jonathan James Butler; Jaylen Butler; Jada Butler; Grady Horner; Cameron Horner; Daniel Kernan; Lea Ann McCartney; James Kernan; Donald McDaniel, II;

Donald McDaniel, Sr.; Shelby McDaniel; James McDaniel; Logan McDaniel; Terasa Defusto; Arik Miller; A.M.; Calandra Bailey; Tyresha Williams; Brandon Paredes; Julie Paredes; Gary Paredes; Jesse Paredes; Adam Paredes; the Estate of Nevaeh Paredes; Evan Pronzati; and Andrew Vega.  In addition, default judgment is denied as to the claims of plaintiff Maricruz Carrera, whose claims are dismissed, pursuant to Federal Rule of Civil Procedure 12(b)(6), for this plaintiff's lack of entitlement to the requested solatium damages.

Defendant Iran is liable for the pain and suffering inflicted on eight servicemember plaintiffs, for economic losses suffered by six of those servicemember plaintiffs, for the emotional distress inflicted on twenty-one immediate family member plaintiffs of these eight servicemember plaintiffs, and for punitive damages equal to compensatory damages.  In total, Iran is liable for $100,726,059 in compensatory damages and $100,726,059 in punitive damages, totaling $201,452,118, plus post-judgment interest at the rate set out in 28 U.S.C. § 1961 and plaintiffs' costs.  These damages are allocated as follows:

1. Servicemember plaintiff Namig Baker is awarded $6,500,000 in compensatory damages for pain and suffering; $2,741,228 in compensatory damages for economic losses; and $9,241,228 in punitive damages, totaling $18,482,456;

2. Servicemember plaintiff Kevin Deas, Sr. is awarded $7,000,000 in compensatory damages for pain and suffering; $2,268,072 in compensatory damages for economic losses; and $9,268,072 in punitive damages, totaling $18,536,144;

3. Servicemember plaintiff Christopher Hardesty is awarded $6,500,000 in compensatory damages for pain and suffering; and $6,500,000 in punitive damages, totaling $13,000,000;

4. Servicemember plaintiff John Iasiello is awarded $7,000,000 in compensatory damages for pain and suffering; and $7,000,000 in punitive damages, totaling $14,000,000;

62

5.  Servicemember plaintiff Joseph Sandlin is awarded $7,000,000 in compensatory damages for pain and suffering; $2,634,388 in compensatory damages for economic losses; and $9,634,388 in punitive damages, totaling $19,268,776;

6.  Servicemember plaintiff Michael Pabon is awarded $7,000,000 in compensatory damages for pain and suffering; $2,310,223 in compensatory damages for economic losses; and $9,310,223 in punitive damages, totaling $18,620,446;

7.  Servicemember plaintiff Scott Smith is awarded $7,000,000 in compensatory damages for pain and suffering; $1,647,488 in compensatory damages for economic losses; and $8,647,488 in punitive damages, totaling $17,294,976;

8.  Servicemember plaintiff Ryan Winston is awarded $6,500,000 in compensatory damages for pain and suffering; $2,374,660 in compensatory damages for economic losses; and $8,874,660 in punitive damages, totaling $17,749,320;

9.  Plaintiff parents Irina Gorodnitsky, Glenn Eli Baker, James Hardesty, and Kelli Hardesty are each awarded $2,500,000 in solatium damages and $2,500,000 in punitive damages, for a total of $5,000,000 each;

10. Plaintiff spouses Eva Carrera and Sophronia Winston are each awarded $4,000,000 in solatium damages and $4,000,000 in punitive damages, for a total of $8,000,000 each; and plaintiff spouse Annmarie Deas is awarded $1,000,000 in solatium damages and $1,000,000 in punitive damages, for a total of $2,000,000;

11. Plaintiff children K.D., A.D., Savannah Sandlin, W.S., R.S., Amari Winston, Jazmine Winston, and Arshianna Winston are each awarded $1,500,000 in solatium damages and $1,500,000 in punitive damages, for a total of $3,000,000 each;

12. Plaintiff siblings Natiq Baker, Samuel Baker, Nicholas Hardesty, Sherman Winston, Corkney Winston, and Tryman Merrel Winston are each awarded $1,250,000 in solatium damages and $1,250,000 in punitive damages, for a total of $2,500,000 each.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  August 28, 2025

_____
**BERYL A. HOWELL**
United States District Judge

64

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NAMIG BAKER, *et al.*,

Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN,

Defendant.

Civil Action No. 22-2765 (BAH)

Judge Beryl A. Howell

## ORDER

Upon consideration of plaintiffs' Motion for Judicial Notice, ECF No. 28, and plaintiffs' Motion for Default Judgment, ECF Nos. 27, 29 (sealed), the related legal memoranda, exhibits, and declarations submitted in support of the motions, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that plaintiffs' Motion for Judicial Notice is **GRANTED**; it is further

**ORDERED** that plaintiffs' Motion for Default Judgment, ECF Nos. 27, 29 (sealed) is **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED** that plaintiffs' Motion for Default Judgment is **DENIED** as to the claims of plaintiffs Johnny Butler, Jr.; Sherita Sanders; Arletha Pettie; Claudia Pettie; Mecko Johnson; Jonathan James Butler; Jaylen Butler; Jada Butler; Grady Horner; Cameron Horner; Daniel Kernan; Lea Ann McCartney; James Kernan; Donald McDaniel, II; Donald McDaniel, Sr.; Shelby McDaniel; James McDaniel; Logan McDaniel; Terasa Defusto; Arik Miller; A.M.; Calandra Bailey; Tyresha Williams; Brandon Paredes; Julie Paredes; Gary Paredes; Jesse Paredes; Adam Paredes; the Estate of Nevaeh Paredes; Evan Pronzati; and Andrew Vega**,** and these claims are

1

**DISMISSED**, pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction; it is further

ORDERED that plaintiffs' Motion for Default Judgment is **DENIED** as to the claims of plaintiff Maricruz Carrera, and her claims are **DISMISSED**, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim; it is further

ORDERED that, upon finding that certain plaintiffs have established their "claims or right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e), plaintiffs' Motion for Default Judgment is **GRANTED** as to plaintiffs Namig Baker, Kevin Deas, Sr., Christopher Hardesty, John Iasiello, Joseph Sandlin, Michael Pabon, Scott Smith, Ryan Winston, Irina Gorodnitsky, G. Eli Baker, James Hardesty, Kelli Hardesty, Annmarie Deas, Eva Carrera, Sophronia Winston, K.D., A.D., Savannah Sandlin, W.S., R.S., Amari Winston, Jazmine Winston, Arshianna Winston, Natiq Baker, Samuel Baker, Nicholas Hardesty, Sherman Winston, Corkney Winston, and Tryman Merrel Winston; it is further

ORDERED that defendant Islamic Republic of Iran shall be liable for compensatory damages in the amount of $100,726,059 and punitive damages in the amount of $100,726,059, resulting in a total award of $201,452,118, plus post-judgment interest at the rate set out in 28 U.S.C. § 1961 and plaintiffs' costs, which shall be allocated in the following manner:

1. Servicemember plaintiff Namig Baker is awarded $6,500,000 in compensatory damages for pain and suffering; $2,741,228 in compensatory damages for economic losses; and $9,241,228 in punitive damages, totaling $18,482,456;

2. Servicemember plaintiff Kevin Deas, Sr. is awarded $7,000,000 in compensatory damages for pain and suffering; $2,268,072 in compensatory damages for economic losses; and $9,268,072 in punitive damages, totaling $18,536,144;

2

3. Servicemember plaintiff Christopher Hardesty is awarded $6,500,000 in compensatory damages for pain and suffering; and $6,500,000 in punitive damages, totaling $13,000,000;

4. Servicemember plaintiff John Iasiello is entitled to $7,000,000 in compensatory damages for pain and suffering; and $7,000,000 in punitive damages, totaling $14,000,000;

5. Servicemember plaintiff Joseph Sandlin is awarded $7,000,000 in compensatory damages for pain and suffering; $2,634,388 in compensatory damages for economic losses; and $9,634,388 in punitive damages, totaling $19,268,776;

6. Servicemember plaintiff Michael Pabon is awarded $7,000,000 in compensatory damages for pain and suffering; $2,310,223 in compensatory damages for economic losses; and $9,310,223 in punitive damages, totaling $18,620,446;

7. Servicemember plaintiff Scott Smith is awarded $7,000,000 in compensatory damages for pain and suffering; $1,647,488 in compensatory damages for economic losses; and $8,647,488 in punitive damages, totaling $17,294,976;

8. Servicemember plaintiff Ryan Winston is awarded $6,500,000 in compensatory damages for pain and suffering; $2,374,660 in compensatory damages for economic losses; and $8,874,660 in punitive damages, totaling $17,749,320;

9. Plaintiff parents Irina Gorodnitsky, Glenn Eli Baker, James Hardesty, and Kelli Hardesty are each awarded $2,500,000 in solatium damages and $2,500,000 in punitive damages, for a total of $5,000,000 each;

10. Plaintiff spouses Eva Carrera and Sophronia Winston are each awarded $4,000,000 in solatium damages and $4,000,000 in punitive damages, for a total of $8,000,000 each; and plaintiff spouse Annmarie Deas is awarded $1,000,000 in solatium damages and $1,000,000 in punitive damages, for a total of $2,000,000;

3

11. Plaintiff children K.D., A.D., Savannah Sandlin, W.S., R.S., Amari Winston, Jazmine Winston, and Arshianna Winston are each awarded $1,500,000 in solatium damages and $1,500,000 in punitive damages, for a total of $3,000,000 each;

12. Plaintiff siblings Natiq Baker, Samuel Baker, Nicholas Hardesty, Sherman Winston, Corkney Winston, and Tryman Merrel Winston are each awarded $1,250,000 in solatium damages and $1,250,000 in punitive damages, for a total of $2,500,000 each; it is further

**ORDERED** that plaintiffs shall, at their own cost and consistent with the requirements of 28 U.S.C. § 1608(e), send a copy of this Order to defendant Islamic Republic of Iran; it is further

**ORDERED** that the Clerk of the Court close this case.

**SO ORDERED**.

DATE: August 28, 2025

*This is a final and appealable order*.

**BERYL A. HOWELL**
United States District Judge

4